IN THE MATTER OF THE TRUST ESTATE OF RICHARD SELLERS, DECEASED.

*New Castle, July 28, 1949.*

*Caleb S. Layton,* of Richards, Layton & Finger, for Equitable Trust Company, successor trustee.

*Robert H. Richards, Jr.,* of Richards, Layton & Finger, for Alexander R. Sellers, Jr., remainderman.

*William Poole* and *George Gray Thouron,* of Southerland, Berl & Potter, for Laura E. Speer, executrix for William H. Speer former trustee.

*John J. Morris, Jr.,* of Hering, Morris, James & Hitchens, for Anna M. Ferris, life beneficiary.

SEITZ, Vice Chancellor: This proceeding requires a determination of the accuracy of certain items in the accounts of a deceased testamentary trustee.

Richard Sellers, hereinafter called the testator, died April 30, 1942, a resident of Bellevue, Delaware. His one page will dated July 5, 1940, provides as follows:

"I, Richard Sellers, of Bellevue, New Castle County, Delaware, make this my last Will and Testament.

"1. I give, devise and bequeath unto my Executor hereinafter named, all my property, real, personal and mixed, wheresoever situate, IN TRUST, to pay the net income thereof for life to my cousin Anna M. Ferris, she to have the right to occupy my home, if she so desires, and the property to be kept up out of the income of my estate.

"2. After the death of Anna M. Ferris, I give One Thousand ($1,000.00) Dollars each unto my nephew William Sellers and my nieces Nancy Bringhurst Hargraves and Edith Sellers Farnum, free of tax.

"3. All the rest, residue and remainder of my estate, after the death of said Anna M. Ferris and after the payment of said pecuniary legacies, I give absolutely to my nephew Alexander Sellers, Jr.

"4. I nominate, constitute and appoint Dr. William H. Speer to be the executor and Trustee of my Will, without Bond."

The testator's assets, as valued for probate purposes at the time of his death, were worth about $750,000. After payment of the taxes and expenses, Dr. William Speer, the executor, turned over to himself as trustee on January 1, 1944 assets valued at approximately $575,000. Dr. Speer will hereinafter be called the "former trustee".

Miss Anna Ferris, the testator's cousin, and the life beneficiary in the testator's will (hereinafter called "life tenant") had been living with the testator for a number of years. She had complete charge of the management of the household affairs and was considered as a member of the family. She was 78 years of age at the testator's death.

The former trustee was a practicing physician and surgeon who continued to be such up until the time of his death in 1948. The testator knew of the former trustee's active practice of medicine for he not only was one of his closest friends, but he consulted with him professionally. The two of them had either lunch or dinner together almost every day and were together on numerous social functions.

The former trustee filed his first account covering the period from January 1, 1944 to December 31, 1945. This account was subsequently approved. After the former trustee's death a second account covering the period from January 1, 1946 to December 31, 1947 was filed, as well as a third account and supplement covering the period January 1, 1948 to May 11, 1948. The trust corpus as of May 1948 was valued at approximately $700,000. Neither the second nor the third account has been approved.

The former trustee died on May 3, 1948, and the Equit-

able Trust Company was appointed successor trustee. Both the successor trustee and the remainderman have filed exceptions to the second and the third accounts of the former trustee. This is the decision on such exceptions.

### SUCCESSOR TRUSTEE'S EXCEPTION (1).

The former trustee's estate has satisfied this exception by paying the successor trustee the sum of $157.25.

### SUCCESSOR TRUSTEE'S EXCEPTIONS (2), (3) AND (4) AND REMAINDERMAN'S EXCEPTION (4) A, B, AND C.

At his death the testator owned $10,000 face value Coral Gables, Florida 6% bonds on which interest had not been paid since January 1, 1930. The former trustee sold these bonds on April 15, 1946 for $9,925, and interest in the amount of $9,773.30 to the date of sale. The entire amount of interest was credited to income. The testator also owned at his death $10,000 face value Erie Railroad Company convertible Series A 4% bonds. Pursuant to a plan of reorganization, the debtor corporation had since December 29, 1941 made available for exchange for the bonds 59 shares of 5% preferred stock, $2,500 face amount income 4½% bonds, and $2,500 face amount of consolidated Series B 4% bonds. Dividends were paid on the preferred stock and interest accrued on the income bonds and Series B bonds prior to the death of the testator. The testator had not made an exchange under the plan prior to his death. After the testator's death, the former trustee made the exchange and credited to income the accumulated interest and dividends amounting to $2,995.

The successor trustee and the remainderman concede that the income from these investments was properly allocated to income for the period commencing at the death of the testator on April 30, 1942. This concession is based on the fact that the life tenant took the actual income from the date of the testator's death, rather than the "equitable

income" provided for by the statute. I shall consider the concession as here controlling and shall, therefore, leave untouched any questions which might otherwise have arisen because of the "equitable income" statute.

The successor trustee and the remainderman contend that all the income which accrued on the Coral Gables and the Erie Railroad bonds prior to the date of the testator's death, and which was subsequently received by the former trustee should have been credited to principal and not to income. The executrix of the estate of the former trustee (hereinafter called the "executrix") and the life tenant concede that as a general rule any income which accrues prior to the death of a testator belongs to the corpus of the estate and cannot be considered as income to the life beneficiary of a trust created by the testator. *Wilmington Trust Co. v. Chapman,* 20 *Del. Ch.* 67, 171 *A.* 222, affirmed *Massey v. Wilmington Trust Co.,* 20 *Del. Ch.* 454, 180 *A.* 927; *Wilmington Trust Co. v. Wilmington Trust Co.,* 25 *Del. Ch.* 193, 15 *A.* 2d 665. They contend, however, that the usual rule is not applicable in the case of a bond which is selling "flat" at the date of such a testator's death. When a bond is selling "flat" there is no segregation of principal and interest in the sale price.

It is conceded that the Coral Gables bonds were selling "flat" at the date of the testator's death, but I am at a loss to see how this aids the estate of the former trustee and the life tenant. As the remainderman points out, the question of selling "flat" does not alter the fact that the bond constituted a contract, and no matter how treated on the open market, the interest continued to accrue. Moreover, the interest accrued up to the date of the testator's death was ultimately paid. No question of payment from a source other than earnings is involved. When paid, it was clearly identifiable as interest due for the period prior to the testator's death. Consequently, unless it can be said that the fact that the money was paid after the commencement of

the trust alters the general rule, it would seem to follow that the interest which accrued on the Coral Gables bonds up to the date of the testator's death should have been credited to corpus. As the Delaware cases show, the delayed payment of the interest does not alter the general rule.

The Erie Railroad bonds could have been exchanged before the testator's death. They were also selling "flat" at the date of the testator's death. However, I see no escape from the application of the general rule that the interest and dividends which accrued prior to the testator's death should have been credited to corpus. The language of the will and the surrounding circumstances do not require any deviation from this rule.

It follows that the enumerated exceptions of the successor trustee and the remainderman to the accounts of the former trustee are allowed to the extent that it is determined that the interest on the Coral Gables bonds ($7,403.30) and the interest and dividends on the Erie Railroad stock and bonds ($179.50) which accrued up to the date of the testator's death constituted corpus, and not income.

My conclusion with respect to the allocation of principal and income is apparently at variance with the allocation used by the former trustee for tax purposes. If the tax allocation was proper, and if it results in any hardship, I can only say that this court must announce and apply Delaware law in this proceeding. Counsel for the life tenant contends that if the court should determine—as it has—that any portion of the income on the Coral Gables and Erie Railroad securities should have been credited to corpus, then such credits should be reduced by the amount of taxes paid on those amounts by the life tenant. The remainderman vigorously opposes this contention on the ground that "there is no reason why the remainderman should bear the loss occasioned by his [the former trustee's] mistake."

In a field fraught with such difficulties as is that involving the allocation of assets and charges between corpus

and income, I think a trustee is entitled to the benefit of any proper equities which appear in his favor. All the evidence in the record points to a good faith allocation by the former trustee after securing the advice of a reputable accountant that these items should be charged to income. Indeed, the Federal Tax Law seems to have required the course taken by the former trustee. I see no reason why the former trustee's estate should be penalized where, had the former trustee made a proper allocation under Delaware law, the taxes would have been borne by the remainderman instead of the life tenant. I, therefore, conclude that the equities require a reduction of the sums to be credited to corpus in connection with the Coral Gables and the Erie Railroad bonds in the amount the remainderman's interest would have borne such tax burden had there been a proper allocation. If, for tax purposes, the proceeds had to be treated as income, then the tax thereon should in common fairness be deducted from such proceeds. The court will hear evidence as to the amount of this item if the parties are unable to agree. It is understood that the Coral Gables bonds were tax exempt.

SUCCESSOR TRUSTEE'S EXCEPTION (4) AND REMAINDERMAN'S EXCEPTION (4) C.

All parties in interest concede that a final liquidating dividend of $3.18 paid by the United States Electric Power Company should have been credited to corpus rather than to income. I agree.

SUCCESSOR TRUSTEE'S EXCEPTIONS (5) AND PART OF (12) AND REMAINDERMAN'S EXCEPTIONS (4) D AND (6) B.

These exceptions attack certain expenditures made by the former trustee on the ground that they should have been charged to income and not to principal. The expenditures consist in part of bills paid by the former trustee and bills for work done, but for which payment had not been made at the time of the former trustee's death. These

exceptions generally deal with work performed on the buildings, swimming pool and trees of the testator's estate at Bellevue.

The successor trustee and remainderman contend that these expenditures were for ordinary repairs by way of maintenance of the estate and, as such, under the testator's will, should have been borne by the life tenant and paid out of income. The executrix and the life tenant contend that the expenditures were properly payable out of principal because the clear intent of the testator was to provide a comfortable home for the life tenant in the style to which she had been accustomed, and in order to accomplish this it was necessary to keep the premises in repair. The repairs were charged to principal, say the executrix and the life tenant, because they were in the nature of improvements or betterments to the estate.

It is conceded by the executrix and the life tenant that the general rule of law is that ordinary repairs and maintenance are paid out of income. They point out, however, that repairs in the nature of improvements or betterment to property benefit the remainderman as well as the life tenant, and are many times charged in whole or in part against the corpus. They contend that two principles of law are applicable to the determination of many of the items here under attack. The first of these two principles is illustrated by the following quotation from 4 *Bogert on Trusts and Trustees*, § 803:

"* * * If the changes in land or buildings are of such an important and lasting nature that they will add value to the corpus as turned over to the remainderman, they should be paid for by the trustee out of trust capital. In determining whether the improvement will outlast the life tenant, mortality tables as to life expectations should be consulted. The actual health of the life cestui may also be considered with some reason. The life cestui ought not to be required to permit income due him to be used to enrich the remainderman, although the life beneficiary must do his part in maintaining the value of the remainderman's interest. If the improvement is purchased with trust capital both life cestui and remainderman contribute, for

the life cestui gets less income thereafter from the other trust capital, on account of the reduced size of that trust capital. The life tenant thus pays for the increased value of the use of the land during the rest of his life, and the remainderman meets the cost of increasing the value of his remainder."

The second principle relied upon is to the effect that where sums of money must be expended by the trustee to rehabilitate trust property which was deteriorated at the inception of the trust, such expenditures are chargeable to principal. Compare: *Savings Investment & Trust Co. v. Little,* 135 *N.J. Eq.* 546, 39 *A.* 2d 392; *In re Griffith's Estate,* 2 *Pa. Dist. R.* 191, 12 *Pa. Co. Ct. R.* 614.

The successor trustee and remainderman do not quarrel with these legal principles. They contend that under the factual picture presented, the testator's will, and the law generally, the following disbursements [Exceptions (5) and (4) D] should have been paid from income rather than from principal:

| | |
|---|---|
| Painting chauffeur's house | $ 550.00 |
| Painting, plastering and repairs to farmhouse, etc. | 1,297.63 |
| Tree service | 600.00 |
| | 2,755.00 |
| Painting gardener's house | 404.60 |
| Swimming pool repairs | 362.72 |
| Copper work, etc., on swimming pool, garage, etc. | $ 558.00 |
| New boilers for garage and farmhouse | 2,187.76 |
| General repairs and improvements | 2,328.38 |

Exceptions (12) and (6) B of the successor trustee and remainderman enumerate some 31 bills which were incurred by the former trustee and not paid prior to his death, and which they contend should be charged to income. No attack is made on the propriety of the former trustee's action in incurring these obligations. Since they were not paid by the former trustee or charged by him to a particular account prior to his death, these 31 items really involve a request for instructions by the successor trustee.

The executrix and the life tenant both appear to concede that the entire Bellevue estate of the testator was to be kept up out of the income from the trust estate. If this is erroneous, the parties will doubtless correct me. Consequently, I assume that any so-called ordinary maintenance and repairs on any part of the estate would normally be payable out of income.

The executrix and the life tenant contend that many of the charges to principal were fully justified under the rule that they constituted payments for extraordinary repairs of a so-called permanent nature. This is particularly true, they say, when the nature of the repairs are considered in the light of the fact that the life tenant at the time these repairs were made had a life expectancy of only about 4 years. She had suffered a stroke of paralysis prior to the time any of the work in question was done and was thereafter confined to her bedroom. Some items of expenditure were required as a consequence of the deteriorated condition of the estate at the inception of the trust.

Having stated the legal principles relied upon, and the substantial contentions of the parties, let us consider in order the various items under attack.

PAINTING CHAUFFEUR'S HOUSE ($550). This item was charged to principal. So far as I can find, no evidence was introduced with respect to this item. The voucher, apparently through inadvertence, was not offered in evidence. I take cognizance of the voucher because it is on file in the office of the Register in Chancery to prove the disbursement. Nothing appearing on this voucher justifies this court in considering this painting work as other than ordinary maintenance. Consequently, I conclude that this sum was improperly charged to corpus.

PAINTING, PLASTERING AND REPAIRS TO FARMHOUSE, ETC. ($1,297.63). From the best reading I can give the

record, it would seem fair to say that so much of this bill as represents carpentry work, plastering and painting was rendered necessary in great part because of the deteriorated condition of the estate at the inception of the trust. The papering would appear to be no more than ordinary maintenance. I conclude, therefore, that the portion of this bill representing painting, plastering and carpentry work amounting to $1,151.43 was properly charged to corpus because the condition of the property at the inception of the trust necessitated these expenditures. While there was, of course, some benefit to the life tenant, I do not believe the former trustee's judgment should be upset here. The balance of the bill amounting to $146.20 should have been charged to income.

TREE SERVICE ($3,355). These expenditures, which were charged to corpus, resulted from elaborate work in pruning and feeding trees on the estate. I appreciate that under the will the life tenant was obligated to keep up the property from the income. However, I believe the testator by this language only intended that ordinary upkeep should be paid from the income. At the time the testator drew his will the life tenant was 76 years of age. Obviously expenditures having any protracted benefit to the estate would inure principally to the benefit of the remainderman. In this situation the law permits the trustee to charge such expenditures in whole or in part to corpus rather than to income. See 4 *Bogert on Trust and Trustees*, § 803. I believe that the expenditure for the tree service which had as its objective the maintenance of the beautiful trees on the estate was principally beneficial to the remainderman. Indeed, at the time the expenditure was made the life tenant was permanently confined to her bedroom. I, therefore, conclude that the expenditures for tree service were properly charged to corpus. While some allocation between corpus and income might have been desirable, nevertheless, I do not believe the trustee's decision in these

matters is to be completely meaningless where reasonable persons could very properly disagree as to the method of treating such an item.

PAINTING GARDENER'S HOUSE ($404.60). The voucher shows that under this item there was painting, papering and finishing of floors in the gardener's house. It is impossible to determine how these items are allocated in the total figure. While it would appear that the painting was rendered necessary because of the neglect extending for a period prior to the inception of the trust, I am unable to identify that portion of the item. The other portions of the bill seem to be clearly matters of ordinary maintenance and chargeable against income. Consequently, all this item will be charged against income unless the amount applicable to the painting of the interior of the gardener's house can be ascertained. If ascertainable, such sum will be allowed as a proper principal charge.

SWIMMING POOL REPAIRS ($362.72). This work consisted of resetting and pointing the flagstones around the swimming pool. I am convinced that this was a proper charge against corpus under the circumstances and in the light of the need for and the nature of the work.

COPPER WORK, ETC., ON SWIMMING POOL, GARAGE, ETC. ($558). The record shows that this was replacement work and that apparently this deterioration commenced prior to the inception of the trust. The unusual nature of the estate and the maintenance problem involved render a decision on the various items extremely difficult. This is particularly true because the parties in examining the witnesses confined themselves principally to procuring admissions as to whether certain work was "ordinary maintenance" or "replacements". These verbal characterizations, while of some assistance, cannot be used as an ultimate touchstone in determining whether the items should be charged to corpus or income. The authorities heretofore

cited demonstrate that the surrounding circumstances at the time of the expenditure may well alter what would otherwise be the determination with respect to a particular disbursement.

The trustee determined that this entire item should be charged to corpus. While it might have been better under the circumstances to have made some allocation, I do not believe that it was inequitable to make this charge against corpus. This charge will not be disturbed.

NEW BOILERS FOR GARAGE AND FARMHOUSE ($2,187.76). This sum involves expenditures for substantial replacements. I feel that under the general rule applicable to so-called replacements, these items were properly charged against corpus.

GENERAL REPAIRS AND IMPROVEMENTS ($2,328.38). Once again the record is vague as to exactly what work was done under this item. The contractor who did this work indicated that at least in part it constituted replacements on various buildings on the estate, including the residence. Apparently the particular type of architecture on this estate constituted a constant problem of maintenance. From this fact it is arguable that much of the so-called replacement work was in fact maintenance of this particular type of structure. The problem is troublesome and particularly difficult because it amounts largely to legally "second guessing" the decision of the former trustee. I am inclined to the belief that these items should have been apportioned between corpus and income in some equitable ratio. Under all the circumstances, it seems to me that it would be equitable to allocate this item 50% to corpus and 50% to income. The percentage is necessarily arbitrary, but so to a great degree is the whole process of allocating disbursements to corpus and to income.

SUCCESSOR TRUSTEE'S EXCEPTIONS (6) AND (7) AND REMAINDERMAN'S EXCEPTIONS (4) E AND (5) A.

These exceptions raise the question of the proper treatment of the cost of certain equipment purchased by the former trustee for the estate. The first set of items involved in these exceptions consists of 1 Dodge Stake Body Truck, 1 "John Deere" tractor, including plow, cultivator, harrow and trailer, 1 power lawn mower, 1 Fulton Sickle Bar and 1 gas range. The gross cost of this equipment amounted to $3,508.61. This amount was charged to corpus, but against the purchase price was credited the sale price or trade in value of certain other equipment consisting of a tractor and 1 Silver King amounting all together to $2,135.[1] The net cost involved in these transactions amounted to $1,373.61.

The second exception here considered involves the purchase of a snowplow costing $405.25 which was charged to principal. It is urged by the successor trustee and remainderman that this item should have been charged to income.

The successor trustee and remainderman take the position that the sale or trade in price of the equipment belonging to the estate at the time the trust was created should be credited to corpus and the purchase price of the new equipment should be taken out of income.

I think it is fairly clear from the testator's will and the surrounding circumstances that he intended the life tenant to have the benefit of the chattels in specie. Such being the case, I believe the trustee properly permitted these chattels to remain on the estate and be used without any charge to the life tenant. See *Woods v. Sullivan*, 31 *Tenn.* 507; *Loring, A Trustee's Handbook*, § 74. With respect to the money expended to purchase new chattels to replace the old ones, I believe the more equitable procedure would have been to amortize out of income the net amount paid. The period of amortization should be based

---

[1] This trade in value or sale price was $85 more than the inventory or appraised value at the time the trust was set up.

on the normal use expectancy of the new chattels. Although the snowplow purchase was not an original asset of the trust, I believe it would be equitable to amortize the purchase price in the same manner as was done with the other chattels. See 2 *Scott on Trusts*, § 233.3, pp. 1265, 1266. In this way the life tenant will pay for the benefit received and yet the remainderman will be adequately protected. The parties may, therefore, reconstruct the transactions in accordance with my conclusions.

SUCCESSOR TRUSTEE'S EXCEPTION (8) AND REMAINDER-MAN'S EXCEPTION (5) B.

The subject matter of these exceptions were satisfactorily explained and the exceptions abandoned.

SUCCESSOR TRUSTEE'S EXCEPTION (9) AND REMAINDER-MAN'S EXCEPTION (5) C.

The first property involved in these exceptions was an undivided one-fourth interest in certain real estate located at Great Kills, Staten Island, New York. In the trustee's first account this interest was appraised at $2,800. The uncontradicted evidence demonstrated that assuming the property to be worth $4,000, nevertheless, prior charges against the interest would more than consume the entire trust interest. Even if we challenge the former trustee's action on the basis of the court order authorizing the sale of the property which the trustee did not carry out, nevertheless, it appears as a fact that the failure to comply with the order of court resulted in no loss to the trust estate. The trustee's action in giving a quitclaim deed with respect to the Seller's interest, while it should have been under an order of court, did not result in any loss to the trust estate.

The second item of real estate involved in these exceptions was an undivided one-fourth interest in proprty located at East Elmhurst, New York. The inventory of the estate showed that this property was carried at a valuation

of $500. The record before me demonstrates that the proportionate part of the prior charges against the land applicable to the Seller's interest far exceeded the value of the interest. This undivided one-fourth interest is still vested in the Seller's estate subject to the heavy liens and encumbrances against it. Under the circumstances, I see no merit to the exceptions.

The third piece of real estate involved in this exception was the undivided one-half interest in an 86 acre tract located at Hunter, Greene County, New York. This property still remains an asset of the Seller's estate. Under the facts in the record, I see no merit to such exceptions.

The record before me demonstrates that in any event the action of the former trustee in his dealings with all three pieces of real estate would have met with judicial approval had they been submitted therefor at the proper time, and no intervening circumstances has altered the situation to the detriment of the trust estate. Compare: 2 *Scott on Trusts*, § 167.1. There is no merit to these exceptions.

SUCCESSOR TRUSTEE'S EXCEPTION (10).

This exception has been abandoned by all parties.

SUCCESSOR TRUSTEE'S EXCEPTION (11) AND REMAINDERMAN'S EXCEPTION (6) A.

The remainderman's brief states that "the remainderman does not wish to press this exception." The successor trustee's brief suggests that the only matter for consideration is whether the payment received by the trust estate can be identified as a payment on account of the indebtedness of Alexander Sellers, Sr. to the testator. If such a determination is here proper, I conclude that the payment was so identified. The exception is, therefore, disallowed.

SUCCESSOR TRUSTEE'S EXCEPTIONS (12), (13), (14) AND (17) AND REMAINDERMAN'S EXCEPTION (6) B.

Successor trustee's exception (12) sets forth numerous bills contracted for, but not paid prior to the death of the former trustee. The position of the successor trustee and the remainderman with respect to these obligations seems to be that, if trust obligations at all, they are all payable from income. On this premise, they contend that when the other adjustments contained in the exceptions to the second and third accounts are made, it will appear that the former trustee over-expended income and consequently invaded the trust corpus. The consequence of their argument is apparent.

While there are some 31 bills set forth in this exception, it is quite clear to me that 26 of them were properly incurred, and the only question is whether the payment should be made from corpus or income. The 5 questionable items include (1) the bill of the architect amounting to $633.76, (2, 3) two bills of the accountants McConnell and Breiden aggregating $665, (4) the bill of Harry W. Mason, bookkeeper, $150 and (5) the bill of Charles Polk, investment counselor, $1,800.

The executrix and the life tenant do not contend that any of the 26 items mentioned in this exception should be charged to corpus, but they do contend that they were proper expenditures. I conclude from the record that these expenditures were proper and should be charged against income.

The other 5 items mentioned in this exception, and which I have identified, are under attack on two fronts. First, it is contended that these were not proper expenditures by the former trustee, and second, if they were proper expenditures, they should be charged to income.

Since none of these 5 items has as yet been charged to either principal or income, it would appear that the court is being asked to give the successor trustee instructions as to how these items should be charged. I say this because

none of these items was paid prior to the death of the former trustee.

Because they embrace the same problems, let us consider the successor trustee's exceptions (13) and (14). Exception (13) attacks five items paid for accounting and investment counseling work. Four of these were paid entirely from income. The life tenant has not filed any exceptions to these payments. Consequently, these items are no concern of the successor trustee and remainderman unless it ultimately appears that there was an unauthorized invasion of corpus. The single item in the successor trustee's exception (13) which was charged to corpus was the item called "investment service" amounting to $3,000. The successor trustee and remainderman contend that if this item is proper at all it should have been paid from income.

Pertinent records in this case indicate that the investment fees paid by the former trustee for the year 1947 were arbitrarily apportioned between principal and income; income bearing $2,000 and corpus $3,000 of the total amount.

Since the former trustee charged a portion of the investment counseling fee to corpus, and since there is another fee for such service amounting to $1,800 payable to Charles Polk which must be properly allocated, it follows that the court must determine whether the former trustee had the power to incur such obligations and have them paid from the trust estate. And further, if he had such power, whether such obligations were proper charges, in whole or in part, against the trust principal.

It would be unwise to generalize with respect to the right of an individual trustee to employ investment counsel and have him paid from the trust. See *In re Greata's Will*, 172 *Misc.* 955, 17 *N.Y.S.2d* 776. Here the investment counselor did a sweeping job of surveying the many securities held in the trust. He recommended many transfers which had as their objective the protection of the corpus. This

entire study was paid for in the first $5,000 payment; of which $3,000 was charged to corpus.

I repeat again, the former trustee was appointed by the testator who well knew he was turning over to a practicing physician a large estate consisting mostly of corporate investments. It is not unreasonable to conclude that the testator should be said to have created a situation which, as a practical matter, necessitated an expenditure of this character. I believe the former trustee was entitled to employ investment counsel and pay him from the trust. The better practice would have been to have asked for court authorization. However, I am convinced that the trust corpus benefited substantially from this service. Certainly the value of the corpus has increased greatly during the period when these services were used. The trust corpus increased by about $130,000. While I recognize that the increase was due in part to the general market rise, nevertheless, the evidence shows real benefit in greater increases and smaller declines than the Dow-Jones market average. The successor trustee states in its report that the moneys in the trust were properly invested; leaving aside the questions involved in the exceptions. The former trustee very properly charged $3,000 of the total to the trust corpus.

The successor trustee also has a bill for investment counseling covering the period up to the former trustee's death. This bill for $1,800 was apparently for recommending sales and purchases and did not involve any great study of the trust and its needs. Once again I feel that this particular trustee under these particular circumstances was entitled to have such services paid for from the trust. I also feel that the service covered by this bill should be apportioned between income and corpus. Under the facts, I think an equal division would be fair and equitable. I re-emphasize that every trustee before incurring an expense of this character should procure court authorization because the services are of a type which, generally speaking, the trustee

should himself perform or at least pay for from his compensation.

We next determine whether the obligations incurred by the former trustee, and due to McConnell and Breiden and to Harry W. Mason for preparation of income tax returns, checking account, and bookkeeping and accounting work should be charged by the former trustee to the trust estate. The items here mentioned, aggregating $815, were incurred but not paid prior to the death of the former trustee. The successor trustee must be instructed as to whether such items are in whole or in part proper trust expenditures. No one suggests that any part of them should be charged to corpus.

Several substantial payments for such services were paid from income by the former trustee and the life tenant did not except thereto. The life tenant suggests that some of this expense should be borne by the former trustee's estate because it was of the type normally included within the duties of a trustee and for which he received commissions.

Let us examine these expenditures in the light of the general rule that a trustee cannot properly incur expenses to be borne by a trust estate in employing agents to do work which he ought to do himself. 1 *Restatement of the Law of Trusts*, § 188c.

McConnell and Breiden seek $565 compensation. No question of the reasonableness of the charge is involved. One bill of McConnell and Breiden dated 4/29/48 in the sum of $390 shows that it was for preparation of state and federal income tax returns for 1947. The second bill totaling $275 was for typing and checking the second account of the former trustee. The sum payable to Mr. Mason was largely for accounting and bookkeeping for the former trustee and amounted to $150.

McConnell and Breiden's bill of $275 was for typing

and checking the second account of the former trustee. Mr. Scott in his work on *Trusts, Volume* 2, § 188.3 says:

"* * * Ordinarily the trustee is expected to keep his own accounts, and although it is proper for him to employ an accountant to assist him, he cannot ordinarily charge the trust estate with payments made to the accountant. In the case of large estates, however, it has been held not improper to employ an accountant or other agent to perform services which in the case of a smaller estate the trustee would be expected personally to perform."

If a trustee in this situation does not desire to type and check his own account, then he should pay for such work from his own commissions. It does not seem to me to be of the character which would come within the exception pointed out by Mr. Scott. I, therefore, conclude that the bill of McConnell and Breiden totaling $275 is not a proper trust expenditure. It should not be paid from the trust estate.

The other bill of McConnell and Breiden in the sum of $390 shows that it was for the preparation of state and federal income tax returns for 1947. Having in mind the nature of the assets of this trust and the complexities which follow from the holding of assets in the form of corporate securities, I believe this individual trustee was entitled to incur reasonable expense to have such returns made out for him. I appreciate that this conclusion gives an individual trustee certain consideration which is not normally accorded a corporate trustee. However, it seems to me that where a testator in this day and age sees fit to name an individual trustee, well knowing his principal occupation and the magnitude and character of the trust to be administered, then he must be said to have realized that the trustee would have to employ the assistance of others in performing some of the more complex trust duties. I, therefore, direct that the bill of McConnell and Breiden for the preparation of tax returns should be paid from the trust. The life tenant suggests that this should be apportioned between corpus and income. I think not. It seems to me that this

is one of the ordinary and necessary duties involved in administering and preserving the trust. As such it is to be paid from income.

Under this item, we come finally to the bill of Mr. Mason in the sum of $150 for accounting and bookkeeping services rendered to the former trustee. Mr. Mason was employed by the testator in his lifetime to perform work of the type which he later continued to perform for the former trustee. This work included the actual preparation of records, vouchers, checks, etc., and the recording of appropriate data in connection with the various transactions. He was paymaster for the estate employees. The former trustee continued to employ Mr. Mason to perform approximately the same duties as he had performed for the testator. However, much of this work was for the benefit of the life tenant.

In view of the testator's knowledge of the former trustee's profession and in view of the size of the estate and the need for maintaining the testator's large estate at Bellevue, Delaware, I think the former trustee was justified in incurring the obligation in question. I conclude that Mr. Mason's bill should be paid from the trust income. While normally only so much of the charges as benefited the trustee would be a trust charge, nevertheless, the balance was for the life tenant and since all this item is to be charged to income, I see no need here to apportion the total figure.

We next consider whether the architect's bill of $633.76 incurred. but not paid prior to the former trustee's death, is a proper charge against the trust estate, and if so, whether it should be charged against corpus or income. The successor trustee says that, if payable at all, it is payable out of income. It is further suggested by the successor trustee that the architect's charges were unreasonable.

The architect employed by the former trustee was the architect who designed the estate for the testator. His

qualifications were of the highest. The type of the architecture employed made it highly desirable to have the advice of one familiar with such architecture. I think the former trustee used good judgment in employing Mr. Sanger. There is no evidence to support the suggestion that his charges were unreasonable.

We have only to determine whether the successor trustee should charge this bill to corpus or to income. It should be noted that a payment for the same purpose shown in the second account was charged to corpus and no exception was apparently taken, except to the reasonableness of the expenditure. I have already stated that there the charge did not appear unreasonable. The suggestion that a local architect might have charged less, if true, does not appear to be a sufficient basis for altering my conclusion.

In view of the type of architecture and the type of the estate involved, I think this bill should be paid from the corpus. Essentially this service was to protect the integrity of the architecture by seeing that any work done would conform to the architectural design of the entire estate. The real benefit of such service under the circumstances would reasonably go to the remainderman.

SUCCESSOR TRUSTEE'S EXCEPTION (15).

The executrix of the former trustee's estate has admitted that the exception is a proper one and has corrected the item under attack by making a payment of $414.75 to the successor trustee.

SUCCESSOR TRUSTEE'S EXCEPTION (18) AND PART OF REMAINDERMAN'S EXCEPTION (6) B.

These exceptions attack the right of the former trustee to employ a Philadelphia attorney and pay him from the trust estate. The former trustee paid this attorney the sum of $750 for legal services rendered during 1946. This

sum was paid from the trust income and the life tenant has filed no exception thereto. I will, therefore, not consider the right of the former trustee to pay this expenditure from the trust income as such. The question as to its effect on the problem of invasion of trust corpus will be deferred.

The former trustee also employed the same Philadelphia attorney during 1947 and 1948 up to May 11. On behalf of the attorney Mr. Ladner, the executrix has filed a petition asking that reasonable counsel fees be allowed Mr. Ladner for his services rendered in 1947 and up to the death of the former trustee in May 1948.[2] Mr. Ladner has requested payment of disbursements and attorney's fee of $2,500 for this period. At the hearing the question of his testifying to the services performed was deferred pending a determination by this court as to whether or not this was a proper charge against the trust estate. Laying aside the reasonableness of the request, and assuming that the attorney performed legal services, should any amount here allowed be charged against the trust estate, and if so, should it be charged against corpus or income?

The answer to the questions posed first requires a consideration of the right of the trustee to incur legal expenses without procuring court authorization. Once again, I feel that a trustee should be very cautious about incurring an expense in the way of substantial attorney's fees without court authorization. In so doing he runs the risk that the court may not allow the expenditure as a proper trust charge. However, I conclude that there are circumstances under which a trustee may employ an attorney, including an out-of-state attorney, and charge the fee against the trust estate. See 2 *Scott on Trusts*, § 244. It will be necessary, therefore, for the court to hear evidence as to the

---

[2] Apparently a Delaware attorney is also owed an unknown sum for services in 1947, 1948 and 1949.

services performed in 1947-48 by Mr. Ladner for which he claims compensation. The right to charge the corpus and/or income of the trust therefor can then be determined, as well as the reasonableness of the charge.

There is apparently one other bill amounting to $50 for services rendered by a Canadian attorney. It appears that the evidence concerning this bill was not introduced. If the parties are unable to agree as to the disposition of this item, further evidence with respect to it may be introduced.

SUCCESSOR TRUSTEE'S EXCEPTION (19) AND REMAINDERMAN'S EXCEPTION (4) F.

This exception attacks the failure of the former trustee to complete the sale of 211 shares of the common stock of Pressed Steel Car Company. The former trustee sold these shares on June 28, 1946 for the sum of $4,792.13, but was unable to make delivery of the certificates because the certificates had not been transferred out of the testators' name and into the name of the former trustee; nor had the former trustee obtained the necessary Inheritance Tax Waivers. The former trustee re-purchased the shares on August 15, 1946 at a cost of $5,589.86. The successor trustee sold the shares about July 26, 1948 for the sum of $1,833.29. The successor trustee urges that the former trustee should be surcharged for the difference between the sales price on the date they were first sold but no delivery made, and the price obtained therefor by the successor trustee. Counsel for the executrix does not appear to defend this transaction, pointing out that it was probably the over-sight of a busy man. It seems clear to me that in view of the lack of evidence showing any legitimate excuse for the failure to consummate the transaction, the former trustee's estate must be charged with the loss thus occasioned. This loss amounted to $2,958.84. The life tenant has not filed any exception with respect to the possible loss of income which resulted from this

principal loss. Consequently, I need not consider the question of interest.

### SUCCESSOR TRUSTEE'S EXCEPTION (16).

In this exception the successor trustee suggested in connection with any claim for allowance of compensation to the former trustee's estate for services rendered by the former trustee during the period January 1, 1946 to May 11, 1948 the court should consider two things: (1) heavy accounting and investment service charges paid by the trust and (2) expenses resulting from the former trustee's failure to accomplish transfer of securities and to settle Canadian Succession Duty. The executrix points out that the former trustee performed many substantial services despite the employment of accountants and investment counselors. It is also pointed out that the trust will be fully reimbursed for the losses resulting from the failure to transfer securities and pay certain taxes.

While it is evident that several exceptions have been allowed in whole or in part, nevertheless, upon examination it will appear that except for the Pressed Steel stock matter, and a few minor matters, the exceptions allowed do not attack matters which reflect on the diligence or good faith of the trustee. Indeed, the successor trustee does not suggest that the former trustee's estate should be denied compensation. It suggests that the compensation should be reduced because of the amount of work the former trustee caused to be done by others and charged to the estate. In view of the manner in which the former trustee was designated, coupled with the size and complexity of the trust, I believe the former trustee, Dr. Speer, through his choice of agents, did a remarkable job. His estate should receive the regular commission which the former trustee would have received for the periods involved. 2 *Scott on Trusts*, § 243; 110 A.L.R. 566.

Obviously, the former trustee's commission will be held

by the successor trustee to the extent necessary to secure the payment of the sum due from the former trustee's estate as improper expenditures. It will also be held to the extent the income of the trust is insufficient to reimburse the corpus for the charges improperly made against it. If this is not sufficient, the estate of the former trustee will be held liable for the balance. Of course, the estate will be entitled to indemnification from the life tenant's income for items properly chargeable to income. Compare: *Darke v. Williamson*, (1858) 25 *Beav.* 622, 53 *Eng. Rep.* 774.

### INVASION OF PRINCIPAL.

It is charged that there was an unauthorized invasion of principal by the former trustees. The parties will be given an opportunity to re-examine this contention in the light of my conclusions. It will be considered, if necessary, at the further hearing to be held in this matter.

### COSTS AND LEGAL FEES.

The executrix of the former trustee's estate has petitioned for the payment from the trust of the costs and attorney's fees incurred in this action by her. I feel that the assessment of court costs incurred in this judicial settlement of the former trustee's second and third accounts should await the ultimate determination of this matter.

The former trustee's estate is entitled to have paid from the trust the reasonable costs and expenses incident to rendering the third account. Only such costs as the former trustee would have incurred had he filed his second account promptly will be allowed from the trust.

The right of the attorneys for the former trustee's estate to be paid from the trust for their services in defending the exceptions to the former trustee's accounts is not free from doubt. On the whole, I think the preferable rule is for the court to consider the reasonableness of the defense of the items questioned by the exceptions. Where the items in

question are of the character which do not reflect on the reasonableness or good faith of the trustee, e.g., whether to charge certain items to corpus or to income, I think the former trustee's estate is entitled to reimbursement from the trust for the services of its attorney. The granting of such compensation and the fixing of the amount will be adjusted by the court in the light of the ultimate showing made on behalf of the former trustee. In this way the court can do equity to all parties. This item will, therefore, be considered at the further hearing.

If the question of interest is relevant—the life tenant filed no exceptions—it will also be considered at the later hearing.

An order accordingly will be entered on notice.