147 N.J. Super. 331 (1976)
371 A.2d 316
IN RE BESSEMER TRUST COMPANY'S INTERIM ACCOUNTINGS AND INITIAL APPLICATION FOR CORPUS COMMISSIONS FOR PHIPPS FAMILY TRUSTS.[1]
Superior Court of New Jersey, Chancery Division.
Decided December 10, 1976.
*338 Mr. Dickinson R. Debevoise, attorney for plaintiff Bessemer Trust Company (Messrs. Riker, Danzig, Scherer & Debevoise, attorneys).
Mr. Kevin J. Coakley, attorney for exceptants (Messrs. McElroy, Connell, Foley & Geiser, attorneys; and Mr. Paul J. Foley, District of Columbia Bar, of counsel).
DWYER, J.S.C.
Three individuals who are income beneficiaries during their respective lives and hold testamentary powers to appoint corpus under one or more of the five trusts for which interim accountings have been filed object to the payment of any corpus commissions. The specific grounds of exception are treated hereafter.
After gradually increasing the percentage of income taken as income commissions from 1% on September 30, 1955 to the full statutory rate of 6% on January 1, 1973, in 1972 the board of directors of Bessemer Trust Company (BTC), a New Jersey corporation, commenced to take corpus commissions at the rate of 1/10 of 1%, or $1,100, under N.J.S.A. 3A:10-2 as supplemented by L. 1972, c. 147, and in 1974 decided to collect the maximum allowable corpus commissions on the trusts which it was administering for the descendants of, and the spouses of the descendants of, *339 Henry Phipps who organized BTC in 1907 as a trust company to administer family trusts. Until the 1960s BTC did not accept trust accounts from persons who were not descendants of, or married to descendants of, Henry Phipps.
Pursuant to the decision in 1974 to charge corpus commissions BTC commenced to obtain approval by settlement agreement, or judicial action, of interim accounts which made allowance for payment of corpus commissions in approximately 550 trusts. The aggregate amount of corpus commissions sought is estimated to be between $10,000,000 and $12,000,000.
The main factor leading to this decision was increased cost related to changes in the roles to be played in the affairs of the Phipps family by BTC and Bessemer Securities Corporation (BSC), a Delaware corporation. The latter is a "personal holding company" within the meaning of Internal Revenue Code, 26 U.S.C.A. § 542, and is exempt from the Investment Company Act of 1940, 15 U.S.C.A. § 80a-1 et seq., and the Investment Advisers Act, 15 U.S.C.A. § 80b-1 et seq. It has 500,000 shares of common stock. BTC separately or with certain cotrustees administers trusts holding over 480,000 of said shares.
Until approximately the 1960s BSC staff rendered, without charge, personal services to members of the Phipps family, such as planning family budgets, paying bills, purchasing both ordinary and exotic items, tax assistance, suggestions as to investments in tax shelters, etc. BSC staff, without charge, also rendered assistance to the board of directors of BTC in making recommendations for investments in trusts which had corpus assets other than BSC common stock to invest, in respect to which the said board then made decisions, and rendered tax advice in preparing returns. Without detailing the dates and the intervening steps by which a system of charges for these services was implemented, it is sufficient to state that BTC by 1972 was paying for computer services, tax assistance and investment *340 advice. Family members began paying for personal services in 1957.
BSC, and its corporate predecessors, is and has been one of the largest investment companies in the United States, with activities currently divided into three areas: (1) management of a diversified portfolio of bonds and common stocks; (2) venture capital with special emphasis on opportunities in technologically related industries, and (3) real estate, with total assets now aggregating between $400,000,000 and $500,000,000 depending on when and how they are valued. The basic capital was part of the proceeds of $75,000,000 received by Henry Phipps when he and his partners, Andrew Carnegie and Henry Fisk, sold their steel business to J.P. Morgan to form the United States Steel Corporation in about 1900. Henry Phipps organized BSC in 1911.
The fact that BSC was an investment company made it necessary that it have a competent staff to deal with investments. As the regulatory and tax laws were enacted and expanded in the 1930s and 1940s it was necessary that the staff of BSC grow to cope with them. Within certain parameters, once a core staff for an investment company is assembled it can manage more funds than it presently has charge of without substantial increase in personnel  i.e., the economy of size. See remarks of Merill Griswold, then chairman of the board of trustees of Massachusetts Investors Trust, at Senate hearings on the Investment Company Act, reproduced in Report of the Securities and Exchange Commission on Public Policy Implications of Investment Company Growth, H. Rep. No. 2337, 89th Cong. 2d Sess. (SEC Rep.) at 94-95. The court finds that BSC staff had the capability to handle BTC work without serious incremental cost.
For the period from 1911 to 1957, the three sons of Henry Phipps  John S. Phipps, Howard Phipps, Henry C. Phipps  as well as Henry Bradley Martin, husband of Helen Phipps Martin, daughter of Henry Phipps, were active in *341 managing the affairs of both BSC and BTC. The fifth child Amy Phipps Guest, served as a director of BTC. Each child had an equal one-fifth interest in BSC from 1911 and in BTC from 1907.
In the early 1930s the Congress enacted a gift tax effective in mid-1932. This as a result of testimony before the Senate to the effect that individuals of substantial wealth avoided paying estate taxes by giving their assets to their children and grandchildren while alive, by creating trusts, the income going to their children and the corpus to their grandchildren.
It is fair to assume that the tax consequences to future generations resulting from the retention of individual ownership of the BSC common stock until after the effective date of the gift tax was obvious to the five children by Henry Phipps. In June 1932, with the exception of Howard Phipps who did not then have minor children, each of the children of Henry Phipps executed indentures of trust with the Palm Beach Trust Company, which was and is another wholly-owned family trust company, and one or more of their brothers or sisters as trustees, and transferred to said trusts their respective holdings in BSC. Subsequently, Howard Phipps created similar trusts for the benefit of his children. As of December 31, 1933 Palm Beach Trust Company resigned as trustee and BTC replaced it as trustee, effective January 1, 1934. Subsequent to the commencement of this action BTC has abandoned claims for corpus commissions prior to January 1, 1934.
One of the June 1932 trusts was established by Amy Guest for the benefit of her daughter, now known as Diana Guest Manning. This trust is designated by BTC as D-6. Since there are five branches of the family, each branch is designated alphabetically by a letter from A to E; e.g., John S. Phipps, A; Henry C. Phipps, B; Howard Phipps, C; Amy Guest, D; and Helen Martin, E, and each trust is designated by a number indicating the sequential order in which that trust was established within that branch of *342 the family. The individual trustees were given broad powers to withhold and accumulate income, and to pay out corpus as well as accumulated income to the named beneficiary or his or her brothers and sisters, except that no individual trustee could ever direct payment to himself or herself.
In respect to income, the indenture for D-6 provides:
2. During the lifetime of the said Diana Henrietta Cornelia Guest to pay out so much of the net income of said trust estate as the said Individual Trustees shall direct and appoint in monthly installments to the said * * * Any income not directed to be paid by the said Individual Trustees shall be held by the Trustees as part of the capital of the trust fund as hereby established.
5. Whenever the net income of the trust estate is referred to in this trust deed, it shall be construed to mean the income of the principal of the trust after the proper deduction of all expenses and charges chargeable to the trust estate, less any allowance for depreciation or reserve for any purpose which the Trustees, in their sole discretion, shall deem advisable, and after the provision has been made by amortization for the wearing of premium on bonds. Extraordinary dividends upon stock shall be distributed to the life tenant only after due provision has been made to protect the integrity of the capital of the trust fund as established.
BTC and the guardian ad litem urge that under said provisions any corpus commissions which are allowed should be charged to income. BTC has computed the corpus commissions chargeable to this trust to be about $505,000 and states that not more than 15% of income for any one year, or $60,000, whichever is less, should be paid in that year.
At the time D-6 was established it was funded with common stock of a wholly-owned Phipps' corporation entitled the Potomac Corporation, which through reorganization became part of BSC. All parties to this action have treated the situation as if the trust had been initially funded with BSC common stock. For practical reasons the court concludes that no other approach is possible based on the extensive record before the court. The significance lies in the fact that since 1911 BSC stock has been subject to a restriction against sale to any one but a member of the Phipps family, a trust for the benefit of one of them, or a trust *343 established by one of them for educational or charitable purposes.
The said restriction was placed on the BSC common stock purportedly to carry out the desire of Henry Phipps that his children regard the original gifts to them as being in trust for themselves and their children, and that no sale of said stock take place without first offering it to other members of the family. The restriction is evidently properly established in the appropriate corporate instruments and stock certificates so as to be enforceable.
Another trust that is before the court is A-23, established by John S. Phipps on December 24, 1931 by indenture with BTC to pay net income to his daughter Margaret Boegner for the purpose of expending it solely for the benefit of his grandchildren Dita Naylor-Leyland and J. Gordon Douglas, III, with the proviso that if they predecease their mother, Margaret Boegner, under certain conditions she is to receive the income. Margaret Boegner also has a testamentary power of appointment over corpus to allocate it among her descendants.
Articles 10 and 11 of said indenture provide:
10. Whenever the net income of the trust estate is payable under this trust deed, it shall mean the income from the principal of the trust after the proper deduction of all expenses and charges chargeable to the trust estate, less any allowance for depreciation or reserve for any purpose the Trustee in its sole discretion, shall deem advisable, and after provision has been made by amortization for the wearing of premium on bonds. Extraordinary dividends upon stock shall be distributed to the life tenants only after due provision has been made to protect the integrity of the capital of the trust fund as established.
11. None of the beneficiaries hereinbefore named shall have any power during the continuance of this trust to dispose of or to charge by way of anticipation any of the estate or interest of whatsoever nature, and whether in possession, reversion, remainder or expectancy hereby given or directed to be given to such beneficiary; and all sums, payable or to be paid or directed to be paid to such beneficiaries hereunder, shall be free and clear of the debts, contracts, alienations and anticipations of such beneficiaries respectively and free and clear of all liabilities for levies and attachments and proceedings of whatsoever kind at law or in equity.
*344 This trust was initially funded by payment of $100,000 cash and presently has a portfolio of diversified securities, none of which is subject to any restriction as to sale.
BTC urges that by reason of the language in Article 10, corpus commissions are chargeable to income. It further states that it will accept the same limitation on payment as in the D-6 trust. The aggregate of corpus commissions is estimated at $33,197 for this trust. The guardian ad litem also urges that corpus commissions are payable out of income.
There are three other trusts presently before the court; i.e., A-42, to pay the income to Margaret Boegner for life with remainder to her descendants, subject to her testamentary power of disposition; D-7 established by Diana Guest Manning in 1935, to pay income to herself and named others for life with remainder to her descendants, subject to her testamentary power of disposition; and E-16, to pay the income for life to Esmond Bradley Martin, Jr. with remainder to his descendants, subject to his testamentary power of disposition.
No one has urged that corpus commissions be paid from the income of these trusts. The trust indentures contain no provision comparable to those quoted above, and either contain no provision expressly dealing with commissions or a provision stating that the trustee may charge commissions but not at a rate higher than permitted under the law of the state applicable to the trustee.
These indentures created powers in individual trustees to shift corpus and/or income at various times among individuals, but the detail of those provisions is not necessary to consider in order to resolve the issues posed in this and related proceedings.
At this point it is appropriate to state how the interim accountings for the five trusts in this proceeding relate to the other proceedings, who the exceptants are, and the grounds of exception.
*345 As noted above, BTC commenced filing a series of accountings in 1974 seeking approval of corpus commissions. The actions were brought ex parte under R. 4:88-2. In 1974 and 1975 BTC filed actions in connection with 52 trusts seeking approval of corpus commissions in accordance with rates set forth in N.J.A.C. § 18:26-7.10, which provides for commissions for executors and administrators in estates which the Inheritance Tax Bureau allows as deductions for purposes of the inheritance tax in uncontested probate matters, for the first 25 years, and the rates in N.J.S.A. 3A:10-2 for the years thereafter. Commissions on corpus taken in those proceedings aggregate $2,209,096.33 but are still subject to judicial approval under R. 4:88-2. In respect to 16 other trusts, settlement agreements were reached on a similar basis for corpus commissions aggregating $298,648. In the related proceedings BTC has shifted to a method of computing commissions on the basis of 5% of first $100,000 and 2-1/2% on the excess for the first 25 years, and the statutory rate of 1/10 of 1% a year thereafter.
In an effort to reach finality and recognizing that historically some members of one branch of the family have opposed the continuation of BSC, BTC during 1975 shifted to a full accounting in each of the remaining 500 trusts. Since exceptions were taken to the accountings in these five trusts, it was decided to treat them as lead cases for resolving similar problems that will arise in the later accountings that are subject to judicial approval. The parties engaged in extensive discovery.
Upon this judge assuming duties in the Chancery Division in September of this year, all parties requested expeditious disposition of these matters because of their potential impact upon the realignment of functions within the group of related corporations, including a trust company newly formed under the National Banking Act having its offices in New York. This is the Bessemer Trust Company, National Association, hereinafter called BTNA. BSC has leased certain space to BTNA, transferred its computer equipment and personnel *346 and its core of investment and tax personnel. In turn, BTNA has contracted with BSC, BTC and Palm Beach Trust Company to provide computer services, investment services and other services. By having its location in New York, by concentrating on trust business, and by accepting trust business from non-Phipps family members, it is hoped that the expenses of operation will be spread over a broader base, thereby minimizing cost under the concept of economy of size referred to earlier.
The three individuals who have filed exceptions are Diana Guest Manning (daughter of Amy Guest and granddaughter of Henry Phipps), Margaret Boegner (daughter of John S. Phipps and granddaughter of Henry Phipps) and Esmond Bradley Martin, Jr. (grandchild of Helen Martin and great grandchild of Henry Phipps). The first two clearly have standing because they are being asked to pay corpus commissions out of income which they otherwise would receive. See Ditmars v. Camden Trust Co., 10 N.J. Super. 306, 335-336 (Ch. Div. 1950), mod. 10 N.J. 471 (1972); 7 N.J. Practice (Clapp, Wills and Administration), (3 ed. 1962) § 1465. In the event that the corpus commissions requested of $19,922 are allowed in the accounting for the E-16 trust, the principal on which income is generated will be reduced and hence adversely affect the income payable to Esmond Bradley Martin, Jr. The court therefore concludes that he also has standing. Compare Koons v. Atlantic City, 134 N.J.L. 329 (Sup. Ct. 1946), aff'd per curiam 135 N.J.L. 204 (E. & A. 1947), and Niles, "Annual Review of Law of New York, Trusts", 21 N.Y.U.L.J. 1477 (1956), wherein the author comments on the possible serious erosion of corpus by permitting annual commissions on actual value of items of corpus under the Surrogate's Court Procedure Act § 2309 (McKinney 1967).
BTC is acting as corporate trustee under inter vivos trusts in the five trusts before the court. It has the privilege of filing an accounting in the Superior Court, Chancery Division. 7 N.J. Practice (Clapp, op. cit.), § 1449 at 154 (3 ed. *347 1962); Donaldson v. Madison, 88 N.J. Super. 574 (Ch. Div. 1965). The court concludes it has jurisdiction.
Exceptants have filed nine separate exceptions. The exceptions were stated in general terms and filed in each of the five accountings. The exceptions can be grouped into the following categories:
(1) BTC is barred from claiming any corpus commissions by laches, waiver, statute of limitations and estoppel  this contention is based on the conduct of family members who served as officers of BTC and who were settlors of some of the trusts in not taking corpus commissions, which conduct expressed an intent that no corpus commissions were to be charged; (2) in respect to the Manning D-6 trust (and all other trusts which hold BSC common stock) the fact that BSC paid its staff to manage the assets of BSC as well as render investment services to BTC means that the earnings from which the dividends of BSC were paid have already borne the costs for pain, trouble and risk normally incurred by a trustee; hence BTC should either not be compensated for handling corpus or its commissions should be adjusted to reflect this fact; (3) standards upon which BTC has computed its commissions are contrary to the statutes and decisions, the base is artificially inflated, and the rate is excessive, particularly in the Manning D-6 trust (and those others holding BSC common stock). Exceptions 8 and 9 are not directed to issues presented within the framework of the five accountings but are directed to the relationship between BTC and BTNA and the contracts between them.
Subsequent to the conclusion of testimony the court requested supplemental briefs on the question of whether BTC was barred from asserting a claim for corpus commissions chargeable to income where it had paid out income without establishing a reserve of income from which to pay the commissions, particularly in the case of trusts such as A-23, which is a spendthrift trust.
The court will decide the issues posed by the first three categories of exceptions, then the issues related to the payment *348 of corpus commissions out of income, and then the exceptions asserted as to the contracts.

1. BTC IS BARRED FROM TAKING INTERIM CORPUS FOR ANY PERIOD PRIOR TO THE PERIOD FOR WHICH BTC IS PRESENTLY ACCOUNTING.
In the Manning D-6 trust BTC is presenting its fifth interim accounting for the period September 1, 1960 to October 31, 1974. The first three interim accountings for the period June 3, 1932 to December 31, 1955 were filed simultaneously and judicially approved on December 20, 1957. Although neither the complaint nor order to show cause referred to corpus commissions, the final judgment recited the fact that no corpus commissions had been applied for and that BTC reserved the right to do so. The fourth interim accounting was settled by an approval agreement covering the period January 1, 1956 to September 1, 1960. It is dated March 21, 1962. It is signed by Diana Guest Manning, her two brothers Winston F.C. Guest and Raymond Guest, and their adult descendants. Paragraph 4 of that agreement states:
It is understood and agreed that the Trustees have not waived and do not waive with respect to income collected during the period of the accounting annexed hereto any right they may have to commissions or additional commissions on income (over and above the amounts of such commissions shown in the annexed account as having been deducted or retained). It is also understood and agreed that although said Bessemer Trust Company and Howard Phipps, as such Trustees, do not at this time ask for commissions on corpus, they have reserved and do reserve to themselves the right to apply for and receive such commissions on corpus both with respect to services rendered heretofore and hereafter to be rendered.
The subject of corpus commissions is of major significance to the Guest group. Each is the beneficiary of a trust similar to D-6. The aggregate of corpus commissions that would be chargeable to income for this group is over *349 $1,500,000. There is neither an allegation nor evidence that each was not fully aware that BTC in 1962 was asserting a right to charge corpus commissions.
In the other four trusts, interim accountings have been filed or approval agreements obtained, for prior periods. In the A-23 trust, a prior judicially approved accounting and an accounting approved by settlement agreement do not reflect any request for corpus commissions.
The schedules attached to each of the accountings as filed show the computation of corpus commissions for the period from the inception of the trusts to the close of the current period. In the case of the Manning D-6 trust, and each other trust containing BSC stock in the other proceedings not part of this action, there is attached as a supporting exhibit a special report prepared by Price Waterhouse & Co. setting forth on a consolidated basis the condition of the corporation at the end of each calendar year and the results of operations for each calendar year from 1931 through 1958 of BSC and affiliated corporations, with copies of annual reports of a similar nature for each year subsequent to 1958 to the close of the accounting period. The testimony during the seven days of hearings covered this period, as did the pretrial discovery.
The complaint requested partial allowance of corpus commissions in the amount of $65,228 less $5,228 taken since 1972 under N.J.S.A. 3A:10-2(c), which provides:
Fiduciaries may annually, without court allowance, take sums as follows on account of corpus commissions; if there is but one fiduciary, the amount so taken may equal 1/5 of 1% of the first $100,000 of corpus and 1/10 of 1% of the value of the corpus in excess of $100,000 or $1,100, whichever is less; * * *
In response to questions by counsel for exceptants and the court, counsel for BTC stated that BTC intended to take commissions on the basis of the computation in Schedule M in the accounting for the D-6 trust; i.e., $505,430 less $3,658 attributable to the period when Palm Beach Trust *350 Company was trustee, or $496,547 ($501,775 less $5,228 previously taken), at the rate of $60,000 in 1974 or 1975 and another $60,000 for 1976 under R. 4:88-2. Counsel for BTC stated that BTC is not certain as to what applications it may make after 1976 for corpus commissions.
Since R. 4:87-1(d) states
The complaint in an action for the settlement of an account
* * *
(d) Shall ask for the allowance of the account, and also for the allowance of commissions and a fee for his attorney, if accountant intends to apply therefor.
Counsel for BTC moved to amend the complaint under R. 4:9-2 to set forth a request for allowance for partial corpus commissions of $496,547 for the period January 1, 1934 to October 31, 1974 to avoid the possibility that having asked for and received approval of partial corpus commissions in the amount of $65,228 BTC would be barred until final accounting from claiming any partial corpus commissions for the period prior to October 31, 1974. Since BTC and the guardian ad litem urge that corpus commissions are only payable out of income, BTC on a final accounting for this trust might find that there was not sufficient undisbursed income to make any further allowance for this period.
The court granted the motion. Exceptants were fully aware at all times that the issue was corpus commissions from at least 1934 to October 31, 1974. They filed exceptions on that basis, conducted discovery on that basis, filed briefs on that basis, and participated in the hearing on that basis. There was no pretrial order. See Cartan v. Cruz Construction Co., 89 N.J. Super. 414 at 422 (App. Div. 1965); Van Corp. v. Ridgefield Mayor and Council, 41 N.J. Super. 74, 81 (App. Div. 1956) certif. den. 22 N.J. 227 (1956). In fairness, counsel for exceptants thought the true request should be stated.
There are two periods before the court, one for corpus commissions and one for income commissions.
*351 Counsel for the exceptants points out that after the decision in In re Moore, 50 N.J. 131 (1967), § 1533 of 7 N.J. Practice (Clapp, Wills and Administration) was rewritten to reflect the Supreme Court's holding and direction to the bench and bar that in allowing interim corpus commissions,
* * * appropriate factors and considerations in arriving at an appropriate rate for commissions on intermediate accounts keeping in mind the thesis that such allowances are only some on account compensation to be conservatively allowed for services during the particular limited accounting period. (Here a rate is never mandatory, even where the estate does not exceed $100,000, but we are speaking primarily of an estate larger than that figure.) The court has to judge the probable total length of administration, the general nature and extent of the services rendered and expected to be rendered, and whether it is likely maximum commissions or nearly so will be allowed on final accounting. While it must take into account what was allowed previously, if the accounting is not the first one, it does not properly do so by computing commissions on the full period of administration to date and then subtracting what you have been earlier awarded. That method is appropriate as we have pointed out, on the allowance of final commissions only and any contrary thought in the Appellate Division opinion (91 N.J. Super. at p. 330) does not, in our opinion, represent the correct practice. [50 N.J. at 147-148 emphasis supplied]
Exceptants urge that under the direction of In re Moore, BTC may only be given corpus commissions for the period of the income accounting, i.e., September 1, 1960 to October 31, 1974. They further contend such a result is consistent with the single controversy doctrine, Falcone v. Middlesex County Med. Soc., 47 N.J. 92 (1966) (where doctor sued for and obtained judgment directing his admission to society he could not later sue for money damages for denial of membership, under single controversy doctrine requiring all related issues to be presented), and the policy of finality of accounts, once approved, reflected in N.J.S.A. 3A:9-8, with the result that under the direction of Moore all periods prior to "the particular limited accounting period" should be treated as res judicata in respect to corpus commissions until the final accounting.
*352 This court understands the Moore decision to be a direction to the trial courts not to apply in simplistic fashion a statutory rate to a base of corpus and apportion on the basis of elapsed time of administration, either for the first 25 years or any period thereafter. The court further understands that the evidence before a trial court on an interim allowance will normally relate to the period of time for which the accounting is filed; hence, there are usually no other factors upon which a trial court can base its judgment. Under such conditions, the trial court must consider what has been previously allowed so as not to award all that is allowable under the statutory maximum and thereby leave nothing for the work yet to be done. This is consistent with the remarks of the Supreme Court in In re Moore, referring to the first period of 25 years and the period for the years thereafter set forth in N.J.S.A. 3A:10-2 where it said:
We do not understand it to set up two distinct periods for commission purposes, one covering the initial 25 years and the other the balance, with commissions for the first period "semi-finally" fixed, so to speak, at the end thereof and those for the second period separately determined at the final termination of the estate * * * [50 N.J. at 144]
This court does not construe In re Moore either to change the basic rule that corpus commissions are to be ultimately fixed at the final accounting or to require that a trustee must apply in each interim accounting for corpus commissions, particularly where they are chargeable to corpus, or be forever barred. The failure to take corpus commissions on an interim basis may redound to the benefit of both the income beneficiary and the remainderpersons. The Legislature has expressly stated in N.J.S.A. 3A:10-2(c):
* * * The failure of a fiduciary or fiduciaries to take commissions in any year as provided in this subsection shall not constitute a waiver of the right of such fiduciary or fiduciaries to take in a subsequent year the commissions not taken for such year * * *.
*353 The court does understand In re Moore to mean that where a trustee has in fact applied and received, or has been denied, requested corpus commissions for a previous period, then a court, in the absence of a special showing, cannot allow any additional commissions for that period on a later interim accounting.
But factually that is not the situation before this court. In respect to corpus commissions this proceeding is the first one in which the trustee has sought corpus commissions. No individual trustee has applied for corpus commissions.
Since the trustee has not previously sought corpus commissions and had the option to wait until final accounting to do so, the trustee is not subject to the rationale of the single controversy rule. The logical application of that rule to any trustee who filed an interim account would be to compel the trustee to seek corpus commissions, thereby destroying the option of waiting until final accounting. Such a rule would hurt both income and remainder beneficiaries by depleting corpus.
The principles underlying waiver, as set forth in West Jersey Title, etc., Co. v. Industrial Trust Co., 27 N.J. 144 (1958), where the Supreme Court said:
"Waiver" is the intentional relinquishment of a known right. It is a voluntary act, "and implies an election by the party to dispense with something of value, or to forego some advantage which he might have demanded and insisted on." George F. Malcolm Inc. v. Burlington City Loan and Trust Co., 115 N.J. Eq. 227 (Ch. 1934) * * * "A waiver, to be operative, must be supported by an agreement founded on a valuable consideration, or the act relied on as a waiver must be such as to estop a party from insisting on performance of the contract or forfeiture of the condition." Aron v. Rialto Realty Co., 100 N.J. Eq. 513 (Ch. 1927) aff'd 102 N.J. Eq. 331 (E. & A. 1928) * * *. [at 152-153]
are not found in the evidence. BTC expressly reserved its rights to apply for corpus commissions in the 1957 judgment and the 1962 approval agreement. These acts are not consistent with intentional relinquishment. In respect to the A-23 trust, since BTC had the option to wait until a final *354 accounting and did not set up a request for corpus commissions, the court concludes it did not waive its right. Further, exceptants have not offered any evidence to show how they have changed position in reliance on BTC's conduct to warrant BTC being estopped.
Exceptants have also alleged that BTC is barred by laches from asserting any claim to corpus commissions because of the passage of time and the death of persons who were family members and officers of BTC. The payment of commissions, whether income or corpus, is a charge to the accounting for the trust for which the trustee must ultimately seek approval and discharge, 76 Am. Jur.2d, Trusts, § 537; hence the trustee has the burden of proof as to the reasonableness of the charge. See McCulloch v. Tomkins, 62 N.J. Eq. 262, 269-270 (Ch. 1901). The records of their actions as directors of BTC remain. The records of each of the trusts remain. The results of the operations of BSC remain. All were introduced in evidence. The court concludes that the doctrine of laches is not applicable on the record before the court.
Exceptants also urge that BTC's claim for corpus commissions is barred by the six-year statute of limitations applicable to contracts or injury to property by analogy, citing Donaldson v. Madison, 88 N.J. Super. 574 (Ch. Div. 1965):
Insofar as this case raises the question of compensation for services prior to January 1, 1958, the trustees are instructed that no commissions may be paid. There is no request for such commissions and none has been taken. There has been and will be no formal accounting for this period. Since there was no suggestion concerning commissions during the period when Mrs. Dodge, the donor, was participating in the administration of the trust (and when she might have made a modification of the trust agreement if so inclined) and since several of the original trustees have died or resigned and been replaced during the period, it is considered under all the circumstances here present that no commissions should be paid for the period and that, by rough analogy to the six year statute of limitations, the trustees should be considered to have waived any claim to commissions on either income or corpus for this period. [at 590-591]
*355 This court construes that language to mean that the court felt that the five-year period preceding the date of Mrs. Dodge's incompetency was an adequate period to inquire into the affairs of the perpetual trust for the support of the municipal building. As equity frequently looks to law, the judge looked to the six-year statute of limitations to see what would be an appropriate period of repose.
This court notes that (at 591) the court deciding Donaldson, supra, did not decide the question of whether there was any right to corpus commissions for perpetual charitable trusts but suggested that the Legislature consider the matter.
If an inter vivos trust indenture, such as exists in these trusts, is construed as a contract and thereby requires a trustee of such a trust to file an accounting every six years or be barred under N.J.S.A. 2A:14-1 from claiming corpus commissions for the elapsed period, such a construction would subject such trustees to a duty that even the court deciding Donaldson said they did not have, 88 N.J. Super. at 595, and would expose the beneficiaries to added expense for such accountings. Such a result would also be inconsistent with the express language of N.J.S.A. 3A:10-2(c) quoted supra. Such a result would also be contrary to the general concept that corpus commissions are fixed at the final accounting. The court concludes that BTC's claim for corpus commissions are not barred by the six-year statute of limitations.
In light of the extensive testimony and the numerous exhibits that have been introduced in evidence the court does not have to decide the matter solely on the basis of the affidavit filed with the account, which the exceptants claim was totally inadequate because of the affiants lack of personal knowledge as to all matters over the 1934-1974 period.
The New Jersey courts have allowed interim corpus commissions after a substantial lapse of time. Commercial Trust Co. v. Barnard, 27 N.J. 332 (1958) (35 years); In re Cox, 21 N.J. Super. 287 (Ch. Div. 1952) (30 years). They *356 have also allowed corpus commissions on a second interim accounting where none were claimed on the first. Gates v. Plainfield Trust Co., 123 N.J. Eq. 519, 520 (Ch. 1938).
In the case of corporate trustees, particularly with the development of trust committees, investment committees, officers committees and account administrators, all of which involve individuals who service a trust, no single individual may have personal knowledge of every aspect of the administration. In respect to such corporate trustees there frequently is a change in personnel due to promotion, retirement, death and individuals leaving for better opportunities.
When an individual trustee dies his executor or administrator must file an accounting for the trust. The affidavit of services required under R. 4:88-1 frequently is based on records and not personal knowledge in such circumstances.
The court concludes that under R. 4:88-1 the affidavit does not have to be based on personal knowledge, but may also be based on records. Under the mandate of the Moore decision supra, that
* * * The trial court's obligation is to fully examine a request for commissions and fix compensation in a fair and adequate amount after application of the principles and guidelines we have set forth, although parties in interest do not object or even consent to the amount requested by the fiduciary * * * [50 N.J. at 149]
the trial court should consider the full record before it and not just the affidavit of services. The court concludes that on the record before it there is a basis for making a determination. The court notes that where the matter is uncontested and the only evidence of "pain, trouble and risk" is an affidavit which does not set forth what was done, a fiduciary invites an allowance in direct proportion to the effort undertaken in drawing the affidavit.
An account properly prepared in accordance with the rules sets forth what changes in corpus assets have occurred, when, and whether there was gain or loss. The affidavit of services is intended to supplement the account and *357 show what pain and trouble was incurred in making those decisions, particularly where there are unusually large amounts of gains or losses and what the tax impacts may have been. To illustrate, one block of securities which had an inventory value of $40 was sold in one year to realize over $200,000 in gain. Except for inquiry by the court, the existence of a different basis for tax purposes and the reasons for the sale of a large block of stock at one time would still be unknown. Mathematically, in the absence of the sale the trust would show a net loss of corpus for the period. This court suggests such information should be in the affidavit of services.
In support of the contention that BTC is estopped from asserting a claim for corpus commissions the exceptants have marshalled several arguments.
First, the BTC records from 1910 to 1930 show that there was an intent to limit commissions to 1% of income. Examination of the records for that period show that most of the acceptances of trust contained such a limitation with the added proviso "until further notice." Although this rate was applied to the trusts in question during the period 1934-1955, the board of directors of BTC increased the rate on income as follows:

 October 1, 1955 to June 31, 1963 1 1/2%
 August 1, 1963 to December 31, 1970 2%
 January 1, 1971 to December 31, 1971 4%
 January 1, 1972 to December 31, 1972 5%
 January 1, 1973 to present 6%

At the time of the initial increase several of the settlors of the trusts before this court, John S. Phipps, Amy Guest and Howard Phipps, were alive and on the board of directors of BTC and voted for the increase in 1955. Exceptants point out that Amy Guest, settlor of D-6, voted against the increase. They have offered no evidence that either she or Diana Guest Manning, income beneficiary of D-6 and settlor and income beneficiary of D-7, ever contended that *358 such an increase, or subsequent increases, violated the terms of the indentures.
Second, the settlors did not want BTC to receive any unnecessary income because it would have been subject to federal income taxes in BTC before it could be passed on as dividends to the family members or now their trusts. This ignores the fact that the family members did vote to increase commissions when necessary to meet rising costs and BTC did pay tax.
Third, certain of the trust indentures contain no express language authorizing the payment of commissions. Where a trust indenture contains no provision, the statutory law applies. In re Moore, supra at 138. The court concludes that a basis for estoppel has not been established.

2. BSC PAID THOSE WHO MANAGED ITS ASSETS  REAL CORPUS OF D-6 TYPE TRUST AND THEREBY THE DIVIDENDS ON THE BSC COMMON STOCK WERE REDUCED WITH THE RESULT THAT THE INCOME BENEFICIARIES OF THE D-6 TYPE TRUSTS HAVE ALREADY PAID FOR THAT WORK; HENCE BTC SHOULD NOT BE PAID CORPUS COMMISSIONS.
The exception considered here was made as to all five trusts. In respect to the four trusts which have diversified portfolios other than BSC common stock (or in trusts that have diversified portfolios and some BSC common stock in the related proceedings), the exception in real terms is that for a period of time BTC received investment and tax advisory service without charge.
There is no charge that appropriate officers and directors of BTC did not make the investment decisions and did not file all proper tax returns for all its trusts at all times. *359 The conclusion that BTC did this is supported by the evidence and the court so finds.
Until some undetermined time in the 1960s the BSC staff was capable of handling the investment work and some of the tax work for the trusts administered by BTC under the principle of economy of size referred to earlier without significant burden to BSC. The court will not detail the dates when BTC established trust committees, investment committees, officers committee, account administrators and hired its own investment officer.
The acceptance of non-Phipps family trusts, the installation of a cost system of accounting, and the development of computer programs to analyze the problems led to the identification of the problems. BTC now pays for those services and has done so since 1971. The fact that BTC did not perform certain functions is a factor to be considered in setting a rate for "pain, trouble and risk."
The record is clear that in respect to the trusts other than the Manning D-6 type trust, BTC had to keep physical control of the securities, maintain the records, receive and transfer securities when bought, sold, redeemed or exchanged, prepare the tax returns, review the portfolio and make the investment decisions. BTC's performance of these functions is also a factor to be considered in setting the allowable rate. But such performance does not warrant a denial of corpus commissions.
In respect to the trusts, such as Manning D-6, which basically have nothing but one or more stock certificates for BSC common stock, the work of the trustee was different.
Exceptants contend that all BTC did was to keep the stock certificates in a vault and record the receipt of the dividend checks four times a year and make disbursement thereof in monthly payments, and that since the sale of BSC common stock was restricted there were no investment decisions to make. Further, the members of the board of directors of BTC and the members of the board of directors of BSC substantially overlapped, so that BTC's contention *360 that its board of directors monitored BSC is fantasy. Finally, the beneficiaries of the D-6 type trusts have already paid for the management of the real corpus  the assets of BSC. Exceptants conclude that BTC incurred no risk because its capitalization in relation to the size of BSC or even to the size of the D-6 trust value is so small.
BTC concedes that the work in caring for the physical assets in the D-6 type trust was minimal. However, it urges that where a trustee is given all, or substantially all, the stock of a corporation in trust, then it has two functions. One is to see that the corporation is properly managed from a business point of view. The other is to see that it generates income and remains a suitable holding for the trust. The authorities it relies upon to show that compensation should be granted to a trustee in both capacities are considered hereafter. It also urges that a trustee in such a position also incurs risk above that of a trustee of a normal trust because it has a double exposure for liability  one to the creditors and stockholders of the corporation and the other to the beneficiaries of a trust. See Cahn, "Estate Corporations," 86 U. Pa. L. Rev. 136, 139 (1937).
BTC urges that as a trustee of each of the Manning D-6 type trusts it should be compensated as a trustee under the normal guidelines as to rate, base and "pain, trouble and risk" for a trustee who handled a separate trust with diversified assets aggregating the same value at the time of accounting. BTC contends that use of guidelines for compensation by analogy to fees for investment companies, investment advisors, or costs for administrative services of such companies as are subject to the federal laws are inappropriate because by definition BSC and BTC are exempt from such laws.
The court will consider: (a) the separate corporate existence of BSC and BTC and the impact of that fact upon the right to compensation; (b) the evidence as to the "pain, trouble and risk" incurred by BTC, and (c) whether it is appropriate to consider BTC as a trustee managing one trust for *361 all the BSC stock or a trustee of each trust with BSC stock, without regard to its efforts in respect to BSC in the other trusts.

(a)
There is no dispute that BSC and BTC are separate corporations. In 7 N.J. Practice (Clapp, Wills and Administration) (3d ed. 1962), § 1529 at 226, the author reviews the cases wherein a fiduciary who managed an unincorporated business was granted or denied compensation in excess of commissions. Then he states that an incorporated business presents a different problem.
* * * Commissions will be allowable as in the case of stock of any other stock held in the estate or trust. The chief difficulty however, is whether the fiduciary is entitled to compensation beyond commissions. If he were an officer or employee of the corporation at decedent's death, can he continue his salary; or indeed can he raise his salary or allow himself a bonus? If he were not an officer or employee then, can the corporation employ him and pay him the fair value of his services where services, such as his, are needed by the corporation and are quite different from those demanded of him as fiduciary? It has been said that in general he is entitled to no compensation beyond his commissions; otherwise he might be tempted to secure a profit for himself at the expense of his trust. [at 227]
The author then cites in a note Restatement, Trusts 2d, § 170, comment (o); Scott, Trusts (3d ed.), § 170.22; Cahn, "Estate Corporations," 86 U. Pa. L. Rev. 136 (1937) which authorities advocate an approach that work done for a business corporation should be compensated by the corporation whether the person is a trustee or not, subject to a duty to account and to liability for breach of trust, and work for the trust should be paid by the trust.
This approach has been applied not only in the cases cited by counsel for BTC but other cases as well.
In Rosencrans v. Fry, 21 N.J. Super. 289 (Ch. Div. 1952), aff'd 12 N.J. 88 (1953), testator who owned 3,045 shares out of 6,661 shares of a corporation, left 20 shares to Fry who had *362 been active in the corporation and 3025 shares to his widow and Fry as trustees for the benefit of his wife and nephews but subject to an option in favor of Fry to purchase. After the court found that the trust had existed for several years, litigation arose when Fry attempted to exercise the option.
Therein attack was made upon salaries and bonuses paid him for his work for the corporation. The court approved exercise of the option and payment of salary and bonus.
* * * Since the testator himself requested that Fry be elected president of the company, neither the receipt of nor proper increases in salaries or bonuses could per se be deemed to violate the trust. The testator contemplated that Fry would receive adequate compensation for his services to the company notwithstanding his role of co-trustee of the stock * * * [at 303-304]
The Appellate Division in In re Seabrook's Estate, 127 N.J. Super. 135 (App. Div. 1974), recognized that several of the corporate officers were executors and had been independently paid by the corporation for that work, but did not conclude that such payment was a bar to executor's commissions and allowed them.
There was also some oversight of the operation of the business of the company, but the executorial trouble in that regard was fairly nominal in view of the facts that the business was well run by McAllister, McCormick and Sidur in their separately paid capacities as employees and officers of the company, and that at least its routine legal problems were being handled by Orlando in his capacity as paid counsel for the company. [at 141]
The Supreme Court of Pennsylvania in In re Davidson's Trust Estate, 354 Pa. 333, 47 A.2d 145 (1946), affirmed payment of compensation to a person for work done for a corporation and separate compensation as a trustee where he was also trustee of an inter vivos trust.
Neither was it of any material significance on the question of the trustee's right to compensation that, as an officer of a company in which both he, individually, and the trust estate owned stock, he had received a salary from the company. He had performed able and valuable services for the company * * * [47 A.2d at 147]
*363 See also, Sueske v. Schofield, 376 Ill. 431, 34 N.E.2d 399 (Sup. Ct. 1941); Hake v. Dilworth, 96 S.W.2d 121 (Tex. Civ. App. 1936); Holmes v. Hrobon, 93 Ohio App. 1, 103 N.E.2d 845 (Ct. App. 1951).
Subject to duties to account and to liability for breach of trust, the court concludes that the compensation of a trustee as trustee should be based on the work that is done for the trust where a fiduciary must have a role in the affairs of a corporation the stock of which the fiduciary controls. The corporation should pay for the work done for it.
The settlors of the Manning D-6 type trust were officers and directors of both BSC and BTC before and after the creation of the trusts. To the extent that they drew salaries both before and after creation of the trust, BSC or its affiliated corporations paid them for the work they did. In the latter part of the period nonfamily members were hired to perform the full time duties of running BSC. BSC paid them. The work had to be done. The results of BSC's operations are known.
It is true that arithmetically the amounts paid to the staff of BSC for managing its assets was deducted from income before determining what could be paid as a dividend, which had to be at least 70% of income as defined for purposes of the Personal Holding Company law, supra. But without such staff there is a question of whether there would have been income at all.
The court concludes that BSC paid for the work done for it. BSC did not pay for the work that BTC did as a trustee in respect to the corpus; hence BTC is not barred from asserting a claim for corpus commissions. The separate corporate entities should be recognized. The relevant inquiry is what "pain, trouble and risk" did BTC incur in the Manning D-6 type trust.

(b)
BTC urges that it had the power to elect the board of directors of BSC. The exercise of this power required judgment *364 in selecting persons to serve and obtaining their consent. This is not a rubber stamp operation. The BSC board of directors has for many years had outside directors.
Unlike a trustee who may invest part of the corpus in one or more mutual funds, which by contract can always be sold at net asset value, or fixed investment companies the securities of which are traded on an exchange, BTC could not sell BSC stock if policy decisions were wrong, but had to change them.
Pursuant to its duties as trustee BTC has sought ways to change the structure of BSC in order to provide for more flexible investments as the years have passed because the needs and circumstances of the various beneficiaries have changed for a variety of reasons. It is sufficient to mention but a few. The tax laws have changed. The number of family members has increased. Regulatory laws have changed. Thus one uniform type holding in a large number of trusts makes it difficult to meet specific needs of individuals.
Beginning in 1955 and continuing to date BTC contends that it has pursued with outside consultants various alternate ways of restructuring BSC. Since 1932 the value of BSC common stock has risen from 12 to 15-fold. Consequently, there is exposure to potentially large capital gains if the change is not tax free.
It is not necessary to detail all the problems under federal tax law under the attribution rules whereby the holdings of certain persons are attributed to his or her relatives in determining whether a reorganization is tax free.
It is also obvious that if any corporate changes are to occur with strangers they will not desire to carry on cost free computer or investment services for BTC. Separately, each of the three areas of BSC's operations  regular investment, venture capital and real estate  may have appeal to a variety of interests, but few organizations in the United States exist that either could or would take all three as a package.
*365 Finally, BTC urges that the risk attendant upon control is not unreal. It points to its over 20 years of litigation in the New York courts. The reference is to In the Matter of the Application of Esmond Bradley Martin (Index No. 1678-1955) (Sup. Ct. 1962), aff'd except as to certain fee allowances 21 A.D.2d 646, 249 N.Y.S.2d 179 (App. Div. 1964), aff'd 16 N.Y.2d 549, 261 N.Y.S.2d 54, 209 N.E.2d 102 (Ct. App. 1965) and subsequent suits. Except to quote the following from the trial court's ruling:
Here settlor deliberately intended that her [Helen Martin's] brothers and sister, having known interests in Bessemer, should continue their association and relationship with it on the same basis as theretofore and that Bessemer should be managed according to the plan faithfully observed by all the Phipps children * * *
it is not necessary to detail all the issues and parties. It is sufficient to state that the New York courts resolved issues of conflict of interest. A subsequent stockholders' action against BTC raising similar issues was dismissed on motion.
Exceptants point out that the outside consultants for corporate change were paid by BSC and the reports delivered to it. The evidence shows that those who read the reports did so in their capacities as officers of BSC and BTC. There is no showing of what effort was expended by independent directors of BTC on this problem. The minutes of the meetings of the board of directors of BTC do not reflect extensive consideration of the problem.
Exceptants contention that risk has to be discounted because of the size of the BTC net worth, has some merit but not as much as the exceptants urge. The individual trustees have not sought corpus commissions; many are persons of substantial wealth. In terms of financial resources it is probable that recovery could be had as against them. Further, in any contest to surcharge BTC for breach of duty as trustee, it would probably be argued that BTC was under-capitalized by those individuals and thereby seek to make up any deficiency from them if BTC were the only trustee. See *366 Yacker v. Weiner, 109 N.J. Super. 351 (Ch. Div. 1970); Cyclopedea Corporations, § 44.1 (perm. ed. repl. 1974).
Finally, in terms of BTC as a separate corporate entity, it faced the risk of extinction  the ultimate risk of a corporate entity.
Considering the testimony, the minutes of the meetings of the board of directors of BTC, the dual roles played by many persons over the years, the staff work of BSC, and the special study done by Price Waterhouse & Co. for the years 1931-1958 for the New York litigation, supra, and the annual reports for the years thereafter to the present, the court finds that BTC did monitor BSC, did vote the BSC stock for sound policies and good directors, did incur risk, and did take physical care of the stock certificates.
The court also finds that these activities were not broken up in time and effort for each trust  except to the extent that proxies had to be executed for separate trusts because of different individual cotrustees and separate physical custody of stock certificates and records for tax purposes. The decision as to whom to vote for as director was not reviewed in each trust. The decision was made once. The decision as to what policy in terms of incentive compensation was not made separately for each trust, it was made once. The effort in the New York litigation was unified. The review of restructuring was made once. Such decisions and activities were then mechanically implemented to reflect the voting power in each trust. Trust committee reviews BSC once a year.
In contrast to a trustee which had to supervise a series of 55 trusts with diversified portfolios of securities ranging in value from $250,000 to $35,000,000 each, the court concludes that the pain and trouble of BTC was less and approaches the minimal on a comparative basis. The court further concludes that the risk was average, if not above average, considering all factors such as the background of the trusts and the family relationships.

*367 (c)
As noted above, the court has found that BTC's efforts in respect to BSC was performed uniformly. The court also finds that it was performed simultaneously. The risk was uniform although the dollar amount of exposure varied with the number of shares in each trust.
A court in awarding corpus commission, at least on a final accounting, must award 5% on the first $100,000 regardless of pain, trouble and risk under N.J.S.A. 3A:10-2. The existence of at least 55 trusts with BSC common stock means that at least $5,500,000 of corpus will generate commissions at the maximum rate of 5% for the first 25 years. The court is not aware of any trust that has less than 100 shares of BSC. Some trusts have holdings of 600 shares of BSC common stock as a result of the resolution of a tax problem in the Estate of John S. Phipps in the early 1960s. Most trusts which hold shares of BSC common stock hold more than that number. At trial there was testimony that the Manning D-6 type trusts, in view of the testamentary powers given therein, have a potential period of administration beyond the year 2030. Under the Legislature's direction as to how the first $100,000 of corpus is to be treated, BTC is assured $275,000 by treating each trust with BSC common stock individually.
If each trust with BSC common stock is treated on an individual basis for the amount of corpus attributable to said BSC common stock, and if the rate of 2-1/2% which the court in In re Seabrook Estate, supra, 127 N.J. Super. at 143, referred to as reasonable for an ordinary estate, is used by BTC, the commissions are indeed very substantial, between $4,000,000 and $5,000,000.
The existence of separate trusts cannot be ignored. The court cannot, and should not, ignore the allowance mandated by the Legislature on the first $100,000.
Since the court has found that the work of BTC in respect to the BSC common stock was performed uniformly, simultaneously *368 and involved primarily a uniform risk per share, the pain trouble and risk should be compensated at a uniform rate.
The court therefore concludes that a uniform rate should be set which should then be applied to a basis consisting of the number of shares multiplied by the appropriate value per share. If a trust has corpus assets other than BSC common stock, then the aggregate value as computed by BTC would be adjusted by subtracting the values attributable to BSC common stock. To the remainder the appropriate rate would be applied. Those values will be assumed in appropriate cases to include the first $100,000 of corpus. To the portion attributable to BSC common stock values the uniform rate should be applied. The sum of the two products will equal the allowable commission. In those few instances where there are not corpus assets in excess of $100,000 without invading values attributable to BSC common stock, then values attributable to BSC common stock shall be assigned to make up the difference and the uniform rate shall not apply to that portion of such values.
In summary, BSC paid those who managed its assets. To the extent that BSC paid those who gave investment advice to the board of directors of BTC, BTC did not incur that pain and trouble, and hence that fact should be reflected in the rate fixed for BTC in the trusts with diversified portfolios. Since BTC monitored BSC uniformly and simultaneously, the rate for BTC's handling of the corpus attributable to BSC common stock should be at a uniform rate. However, BTC's right to compensation in each trust must be separately evaluated and allowed.

3. BASE AND RATE UPON WHICH BTC HAS COMPUTED COMMISSION ARE EXCESSIVE AND CONTRARY TO APPLICABLE STATUTES AND DECISIONS.
Exceptants concentrated their objection on the Manning D-6 trust. The corpus of said trust consists primarily of *369 values attributable to BSC common stock  approximately 99.85%. As more fully developed hereafter, exceptants urge that market value in this situation does not allow for capital gains, blockage and the fact that some values are based on opinion of management.
The other four trusts have corpus assets which consist of investments in diversified portfolio of bonds and common stocks most of which are listed on a recognized exchange. The valuation of such assets therefore does not present the unusual problems associated with the D-6 trust,
BTC has prepared and filed the accountings in accordance with R. 4:87-2 and filed a statement in accordance with R. 4:87-2 (b) (6) as to the basis upon which commissions are computed. For purposes of computing commissions, BTC has uniformly used the fair market value of the assets at the close of the accounting period except in the case of BSC common stock, which it has discounted by 30%.
In respect to the four trusts other than the Manning D-6 trust, the use of market value of the securities is consistent with the decision in In re Estate of Higgins, 61 N.J. Super. 291 (Cty. Ct. 1960), and comment in In re Moore, supra, 50 N.J. 131.
In Higgins, the court said:
Neither the statute nor any reported decision appears to have settled conclusively that the commissions on intermediate accountings shall be based upon inventory value or market value at the time of the accounting. In re Cox, 21 N.J. Super. 287 (Ch. Div. 1952), recognizes market value at the time of the accounting as "an element in fixing commissions." The court held that the increase in market value of securities held "is not especially persuasive for the allowance of unusually large commissions." In Commercial Trust Co. of New Jersey v. Barnard, supra [27 N.J. 332], the Supreme Court appears to have approved commissions based upon market value at the time of an intermediate accounting, but did not address itself to the point. In Blauvelt v. Citizens Trust Co., supra [3 N.J. 545], the allowance of commissions based on inventory value on intermediate accounting was approved although some of the assets became worthless by the time of final accounting [at 296]
*370 That court went on to note that the Governor had vetoed a bill that would have allowed commissions on the basis of the "true and reasonable value" as of the date of the closing of the intermediate account, on the ground that in appropriate cases the courts had power to use current values on intermediate accountings  particularly where a fiduciary had died  but that the emphasis was to be placed on "pains, trouble and risk."
The Supreme Court in In re Moore, supra, 50 N.J. at 146-147 did not disapprove the use of current values in determining the base for computing corpus commissions on an intermediate accounting. It hinted that such values should be used with caution and concluded that where the increase in value over inventory value is due to inflation, then a lower rate should be utilized where current values are used instead of inventory values, citing Appleby v. Appleby, 140 N.J. Eq. 8, 12 (Ch. 1947).
By L. 1972, c. 147, the Legislature, in respect to the base upon which intermediate commissions may be computed, has provided N.J.S.A. 3A:10-2(c):
* * * In computing the amount of commissions which may be taken annually pursuant to this subsection, the value of any item of corpus at the time when such item came into the hands of the fiduciary or fiduciaries, herein in this section referred to as the "presumptive value" of such item, may be used as the value of such item, or, at the option of the fiduciary, the value of such item at the end of the period for which such commissions are taken may be used. The failure of a fiduciary or fiduciaries to take commissions in any year as provided in this subsection shall not constitute a waiver of the right of such fiduciary or fiduciaries to take in a subsequent year the commissions not taken for such year. Commissions taken as provided in this subsection shall be subject to review on intermediate and final accountings, and to the extent that aggregate commissions so taken exceed the commissions allowable under paragraphs (2) and (3) of subsection a. of this section, they shall be disallowed.
d. In the event of a dispute as to the value of corpus on the settlement of the account of a fiduciary or fiduciaries, the burden of proving that the value of any item of corpus differs from the presumptive value of such item shall be upon such fiduciary or fiduciaries or other party claiming such difference.
*371 Counsel have not referred the court to any case construing said statute. The court has found none.
Although the language of L. 1972, c. 147, as set forth in N.J.S.A. 3A:10-2(c), expressly authorizes a fiduciary to use a value other than an inventory value, when computing and taking corpus commissions on an annual basis without court approval, and states that if such commissions exceed the amount of commissions allowable under the subsections as the statute read before amendment, then the excess shall be disallowed. The court interprets the statute to mean that a fiduciary may use the optional value as the basis for computing corpus in a nonjudicially-approved computation with the right to carry forward that basis on filing the accounting. This is consistent with the prior judicial construction of the act and the interpretation of the Governor acquiesced in by the Legislature.
The court concludes that the use of current market values is not an improper basis upon which to compute corpus commissions on an intermediate accounting where the assets can be valued on regular markets.
However, the ultimate base remains, "on all corpus that comes into the fiduciary's hands" N.J.S.A. 3A:10-2(a) (2), which connotes an element of finality if not realization. It is this thought that has moved the courts to lower the rate when unrealized values are utilized as the base in order to assure that allowances can be determined at the final accounting.
In respect to the four trusts, other than the Manning D-6 trust, neither the exceptants nor any guardian ad litem has pointed to any errors in valuation. The court notes that in a few instances where BTC has held a few shares of one of the closely held corporations existing in a particular branch of the family, it has carried the stock at nominal value until such corporation was liquidated and has used the nominal value as part of the base for computing corpus commissions. The court concludes that the approach used by BTC in constructing the base on current *372 market values for computing corpus commissions in the four trusts, other than Manning D-6, is proper.[2]
The court notes that in respect to the small portion of the corpus of the D-6 trust not invested in BSC, BTC had market values for the period 1944 through 1973 except the years 1945 and 1957. To develop a value for those years, BTC averaged arithmetically the year end values of 1944 and 1946 for the 1945 value and did the same for 1957 using 1956 and 1958 year end values.
For the period 1932 through 1943 the year end market values were not available. BTC therefore took the values from its records and from tax returns. It then used the compound interest method to build a series of year end values. Neither the exceptants nor the guardian ad litem have made any specific comment on this technique. Since BTC is faced with developing values over a period of time, this technique, which is based on the concept that a savings account increases in value with the passage of time by the addition of interest, attributes the smaller values to the earliest period and the larger values to the later period. The court finds this technique appropriate on these facts.
*373 In respect to the valuation of BSC common stock, the schedule filed under R. 4:87-2(b) (6) states:
(C) As to the stock of Bessemer Securities Corporation, the underlying net asset values were available for the years 1961 through 1973. For the years prior to 1961, valuations made by an independent accounting firm for the years 1931, 1938, 1948, 1954 and 1958 were available, and the compound interest method was used to arrive at values for the intervening years. The market value of Bessemer Securities Corporation stock was then calculated by reducing the underlying net asset values by 30% to conform with discounts used in recent estate tax and gift tax valuations.
Testimony at the hearing established a 10% discount was used in compromising a claim that John S. Phipps' estate should be taxed as if he had control during his life of all the stock in the trusts in his branch of the family because of his position as president of BSC and BTC. In such a proceeding the question emphasized is, what is the dollar amount to be paid, and the mechanics to justify the result are frequently of secondary importance.
Testimony also established that a 30% rate of discount was finally accepted on certain gifts of BSC stock made by Howard Phipps in or about 1963. The size of the gifts and other details were not developed. It is doubtful that either the donor or the I.R.S. ever entertained the idea of undertaking an appraisal of BSC to arrive at a proper discount.
In the Manning D-6 trust the inventory value is $33,000. BTC is not relying on that "presumptive value" but is proceeding on an optional value. It has the burden of proof. N.J.S.A. 3A:10-2(d). The test is the fair preponderance of the credible evidence. Joseph v. Passaic Hospital Ass'n, 26 N.J. 557 (1958); Pabon v. Hackensack Auto Sales, Inc., 63 N.J. Super. 476 (App. Div. 1960); Bogert, Trusts and Trustees (2 ed. 1962) § 972(9).
Pursuant to Evid. R. 9(1) the court may take notice that the stocks or securities of closed end investment companies regularly trade at a discount from the net asset value of the underlying securities, even when such securities *374 are listed on national exchanges. The percentage of such discount for such corporations are published in the financial journals and larger newspapers of general circulation. In the New York Times the data appears each Saturday. The range is 13% to 45%.
The factor of the discount is also one of the subjects discussed in a BTC exhibit (P-11).
Exceptants urge that BTC has allowed no factor for unrealized capital gains, has failed to recognize that the holdings of common stock are so large that they cannot be sold at market price but only at a discount (blockage), and has failed to make provision for brokerage and tax fees. They further urge that there is a potential for loss. They conclude this area by pointing out that the auditors annually make the same observations in the financial notes of the annual reports.
Exceptants further urge that in the area of venture capital, BTC holds unregistered stock, joint interests and new companies with promising but undeveloped products not all of which will be developed commercially, and other property rights which are difficult to value. They urge that a discount of 30% is not enough but suggest no alternative.
In respect to real estate, exceptants point out the distressed state of the real estate industry generally, as well as the results of the real estate operations associated with BSC in the annual reports. They urge that 30% discount is not enough but suggest no alternative.
The New Jersey courts have recognized that the valuation of stock of a closely held corporation is a difficult task. Bassett v. Neeld, 23 N.J. 551 (1957); Tracy v. Alexander, 17 N.J. 397 (1955). In Bassett the problem was to value the stock of a family investment company, considerably smaller than BSC, for purposes of the inheritance tax. The Supreme Court stated that the Director erred in basing his value solely upon a net asset value approach, because all relevant factors should have been considered.
*375 Exceptants have urged that a capitalization of dividends approach should be used. They produced no witness to testify as to what an appropriate rate would be or why that technique should be used under a statute that allows a percentage on "all corpus that comes into the fiduciary's hands" N.J.S.A. 3A:10-2(a) (2).
This court is not faced with the problem of finding what the present value of BSC is. As to some material for such an undertaking, see Colonial Trust v. Kraemer, 63 F. Supp. 866 (D.C.D. Conn. 1945) (family owned investment company which owned real estate, art works and listed securities which were discounted from market value; evidence showed that the prevailing discount then was 30% to 36% for listed closed-end investment companies.); Rice, "The Valuation of Closely Held Stocks," 98 U. Pa. L. Rev. 367 (1950); Stiegelmeier, "Valuation of Closely Held Stock for Estate Tax Purposes," 45 Ill. Bar. J. 18 (1956) (article written after Rev. Rul. 54-77 [I.R.B. 1954-9] made some of the changes recommended by Rice to limit the standard of all other relevant factors for Federal purposes). This court is concerned with the problem of whether the accounting fiduciary has submitted such credible evidence that the court may properly find that the base upon which corpus commissions are being computed is reasonable, bearing in mind that compensation must be allowed for the balance of the period of administration and must be fixed on final accounting. Testimony establishes that the Manning D-6 and similar trusts may not terminate until 2030 to 2040 because of the testamentary powers of appointment.
Although the court has over 200 exhibits before it, and several run to several volumes, schedules of the underlying assets of BSC for each year have not been presented. If such detail existed and were presented, any court of necessity would have to ask the parties to summarize it in order to deal with it. The court does have the special study done by Price Waterhouse & Co. for the years 1931 to 1958. In this work several other consultants worked with Price Waterhouse *376 & Co. to state realistically the values on consolidated basis for the New York litigation. The court finds it is a useful document but notes that Price Waterhouse & Co. states that it is not certifying the values but only that the methods used to get them are appropriate under the circumstances.
In doing the annual audits of BSC and preparing the annual reports for BSC's stockholders, Price Waterhouse & Co. has followed the guidelines established by the SEC in its Accounting Series Releases for Investment Companies registered under the Investment Company Act, supra. Although BSC is not subject to said act, the accounting principles set forth in those guidelines reflect considerable independent thought as to how to fairly present the current values of such organizations and have been revised from time to time as new problems were recognized. The court here sets forth in footnote 3[3] extracts from ASR 118 and Investment Company Act Rel. No. 6295 (12/23/70).
*377 Note 2 to the special study for the 1931-1958 period states:
Since all of the common stock of Bessemer Securities Corporation is closely held and has never been traded, there is no way of determining the realizable worth of the common stock of the corporation in the open market. In order to facilitate general comparison of book amounts of the assets of the corporation with contemporaneous market values, management has made estimates of valuations on the bases described below. These valuations do not purport to be amounts realizable on liquidation since no provision has been made for income or other taxes, brokerage or sales commissions or other expenses which would be incurred upon disposal; furthermore, no consideration has been given to the possible effect on realization amounts of offering for sale large holdings of individual securities and real estate.
Similar and more detailed notes appear in the annual reports for later years.
At the hearing an officer of BSC testified that the assets of BSC were valued by the following standards. Listed securities at market price quotations. The staff working with venture capital set the values based on price/earning ratios developed by looking at what were comparable businesses and determining at what their shares sold for and what their *378 earnings were as well as considering the book value to BSC. In respect to real estate ventures, the staff assigned to that area of operations used outside appraisals, fair market sales for units of larger developments and sales of comparable real estate parcels to reach their valuations. For purposes of determining base for corpus, liabilities were deducted. Then the final value was discounted by 30%. This was confirmed by testimony of an officer of BTC.
Testimony at the hearing also revealed that 8% of assets is in venture capital and 17% in real estate today. This distribution has varied over the years. The annual reports also reveal that these two operations have also been leveraged by use of bank loans backed up by guarantees of BSC which expose the listed securities to risk. Depending on the year and the level of the stock market, the exposure has been as large as ten percent of the listed securities.
Subsequent to the final argument, counsel for BTC submitted a letter stating that management discounted on average venture capital 20% and real estate 30% from book values before applying the 30% discount.
In connection with showing the pain and trouble of BTC in monitoring the affairs of BSC, BTC introduced a report of an independent consultant as to alternative plans for reorganizing BSC and the problems attendant on each alternative.
In respect to value, the consultant confirmed that the listed securities would be discounted and pointed to the discounts that exist for other listed stocks of fixed investment companies. It noted that the venture capital section was a good one and had a good record. Unless split into a separate unit and sold to a special buyer, any other buyer would substantially discount those assets. If the former course is pursued, there is the possibility of a capital gains tax the rates of which have just been increased. In respect to the real estate, the consultant stated that at the present time it is questionable whether there is a regular market.
*379 Although said report was not offered on the subject of value of the base for corpus commissions, and the court recognizes that the expert was not produced for examination, BTC produced the report. The court concludes that it is proper to consider the contents on value, particularly when the observations accord with other economic data that is generally well known.
It has been suggested in In re Cox, supra, that the place to adjust for uncertainty is in the rate. However, in that case the base was smaller and involved listed securities. Here the court is asked to go from an inventory value of $33,000 to $19,288,500 at the end of 1974, assuming a 30% discount.
The court recognizes that the 30% discounted market value has been used for each year and the leap is not as great as just stated. But the court also notes that at the end of 1968 the value of corpus was $28,921,200 after a 30% discount which in magnitude shows a substantial drop to 1974.
The court recognizes that the 30% discounted market basis other than "presumptive value" on an interim accounting to compute corpus commissions, a court should examine that base and adjust it to a base consistent with the facts as found on a fair preponderance of the credible evidence.
The risk of payment on the guarantees is not a mere possibility. The evidence establishes that in respect to the real estate operations payments by BSC are probable. This factor did not exist when the 30% rate was fixed. The task of realigning BSC has increased the potential for incurring capital gains taxes  the rate for which has increased 10% under the Tax Reform Act of 1976. This increased rate will also reduce the amount of unrealized gain that can be converted to cash and be reinvested. Finally, there is evidence that included among the securities portfolio of BSC are assets aggregating about 16 2/3% of all security assets that are valued on the basis of management's judgment because no market prices are available. The court finds that the 30% discount percentage was fixed without *380 consideration of two of these factors  probability of payment and increase in capital gains tax rates, and without having to consider the higher percentage of securities operations presently in securities for which quotations are not readily available.
The court concludes that the discount rate should be 40% of the year end market value for each year since 1934 on the BSC common stock, for although the average year end values are used to reflect time, the end product is the base.
BTC has utilized two sets of rates. The first set is applied in the accountings for the five trusts before the court and is taken from N.J.A.C. 18:26-7.10, which sets forth rates the Director of the Inheritance Tax Bureau will allow for commissions on administration of an estate to compute the deduction from the total estate for administration expenses in an uncontested proceeding. Those rates are:

 First $100,000 5%
 Next 400,000 3 1/2%
 Next 500,000 3%
 Excess over 1,000,000 2%

The other set is 5% on the first $100,000 and 2 1/2% on the excess over $100,000. The latter rates are attributed to the Appellate Division in In re Estate of Seabrook, supra.
* * * If pains, trouble and risk here were average, neither high nor low, and no other depreciating factor were present, a rate of roughly half the maximum of 5% or from 2 1/2% to 3% would be appropriate.[1] [at 127 N.J. Super. at 140]
Each set of rates is used for the first 25-year period and the statutory rate of 1/10 of 1% for the balance of the years.
The court notes that both sources for the rates are intended to compensate for the entire administration of an estate where all the work is complete and the results known.
*381 The computation for the corpus commissions for the Manning D-6 trust is set forth below without correction from 30% to 40% discount or for starting the computation in 1934 instead of 1932.

 COMPUTATION OF CORPUS COMMISSIONS
Average year-end market value of
 Trust Corpus for years from
 1932 through 1956 $ 5,993,368
 5% on first $100,000 of corpus $ 5,000
 3 1/2% on next $500,000 of corpus 14,000
 3% on next $500,000 of corpus 15,000
 2% on balance of $4,993,368 99,867
 ________
 Total commission for period
 from 1932 through 1956 $ 133,867
Total sum of year-end market
 values of trust corpus for
 years from 1957 through 1973 $371,562,865
 ____________
 $371,562,865 X .001 = $ 371,563
 Commissions for period from
 1932 through 1956 $133,867
 Commissions for period from
 1956 through 1973 371,563
 ________
 Total commissions calculated $ 505,430

Counsel for BTC urges that the computation on the aforesaid basis does not reflect a computation designed to lock up on a semifinal basis the commissions for the first 25 years, contrary to the dictates of In re Moore, supra, 50 N.J. at 144.
Counsel urged at final argument that the amount for the entire period 1932 to 1974 being asked for, when divided by the base, produces an effective rate of 2.42%. Since the maximum allowable by the statute is 5%, there is sufficient leeway left to compensate for the work yet to be done. The manner of presentation, it is further urged, is dictated by the provisions of the statute that is worded in terms of the first 25 years and the period of years thereafter.
Since the decision in In re Moore, supra, the Legislature added subsections (b), (c) and (d) by L. 1972, c. 147, to *382 N.J.S.A. 3A:10-2. In subsection (c) the Legislature permits a fiduciary to take annually corpus commissions without court allowance at the rate of 1/5 of 1% on the first $100,000 and 1/10 of 1% on the excess over $100,000 subject to a maximum of $1,100. The $1,100 limit applies to the amount determined by both rates. At the end of 25 years $27,500 may be taken. If $5,000 is taken on $100,000, $22,500 remains. 2 1/2% of $900,000 equals $22,500. If a lower rate is used, a large base may be included.
Since a fiduciary on final accounting is entitled to 5% on the first $100,000 for a period of administration not in excess of 25 years, without regard to pain, trouble or risk, and since the Legislature has now authorized a fiduciary to take annually at that rate without court approval, this court concludes that allowance, if any is made, on the first $100,000 of corpus should be made at that rate; i.e., 1/5 of 1% a year on an interim accounting. The court concludes that if the Legislature authorized the taking of the 1/5 of 1% without approval, and the fiduciary does not have to prove pain, trouble and risk, there is at least a presumption that the fiduciary should be allowed to keep it in the absence of evidence of forfeiture. Except as just stated, the Legislature has not modified the decision in In re Moore, supra.
For convenience, the court repeats the factors emphasized by the Supreme Court to be considered on an interim accounting for the allowance of corpus commissions:
* * * such allowances are only some on account compensation to be conservatively allowed for services during the particular limited accounting period. * * * The court has to judge the probable total length of administration, the general nature and extent of the services rendered and expected to be rendered, and whether it is likely maximum commissions or nearly so will be allowed on final accounting. * * * [50 N.J. at 147-148]
In respect to the trusts, such as the Manning D-6 trust, the court has heretofore found that much of the pain and trouble of BTC was incurred uniformly and simultaneously *383 for all the trusts containing BSC common stock as part of the corpus.
Such facts as indicated extra work was done because of the presence of BSC common stock arose because of matters extraneous to the trusts, as in the case of the estate of John S. Phipps or the gifts of Howard Phipps. The impact on the trusts was to sell some of the BSC stock to raise cash to pay taxes in the case of the estate of John S. Phipps. This material is really background information, for it does not relate to any of the five trusts before the court.
The court has recognized and found that BTC incurred average risk, if not above average risk, in respect to holding BSC common stock.
The court has also found that BTC did not have to make the investment decisions, do the research that a trustee normally does for investments, keep the records for changes in corpus assets in respect to BSC common stock, or struggle with the provisions of the Internal Revenue Code on capital gains and losses or file tax returns related thereto. This is a substantial reduction of pain and trouble for a trustee.
Counsel have not referred the court to any case or article discussing the problem of proper compensation to a trustee under the facts of this case.
The court has read with interest the comments of Shattuck, who edited Loring, Trustees Handbook for many years and who was a reporter for the Restatement, Trusts, in his article "Investment by American Fiduciaries in Mutual Funds, 25 Bost. U.L. Rev. 1 (1945) wherein he analyzed the problems a trustee faced in investing in open-ended mutual funds of the Massachusetts Trust type and concluded that such investments were proper under the conditions therein stated.
He raised the question of whether the trust would be subject to paying twice for investment advice  once for the fees to the investment adviser of the fund and twice when the trustee was given compensation in his commission allowance:
*384 * * * Thus it would appear that the underlying or participating trust is not only furnishing compensation to its own fiduciary but is also suffering a debit in its participating earnings for a second and nearly equal compensation paid to the manager of the investment trust. The problem created by this state of affairs is both practical and legal * * * [at 22]
In respect to the practical problem, the author states the question is whether the fee paid is justified by attaining better results. In respect to trusts with small corpus he suggests that a well organized staff of professional managers may do a better job because of the ability to diversify a small sum over a larger portfolio.
In respect to whether a legal problem exists, the author states:
* * * I suppose not, except as it is inextricably combined with the question of delegation which we have heretofore discussed. If the delegation is proper a reasonable fee must be proper * * *
* * * It is not clear that the compensation of an investment counsel is a proper deduction but the reason for that uncertainty, is, of course, that it is not yet clear that the trustee has the right to place reliance upon investment counsel in any manner comparable to the reliance which he places upon legal counsel * * *
* * * I feel certain that the aspect of `double compensation' will give no trouble if the chief theoretical objection to purchase shares in an investment is once removed. It has in my opinion no independent force of its own. [at 24]
The Supreme Court of Minnesota, in In re Butler's Trusts, 223 Minn. 196, 26 N.W.2d 204 (1947), cert. den. 332 U.S. 759, 68 S.Ct. 59, 92 L.Ed. 345 (1947), affirmed the trial court's denial of the trustee's request to be permitted to pay as expenses of each trust an allocated share of salaries of employees of another corporation who did clerical work and gathered investment data for the board of directors of the corporate trustee. The corporate trustee was organized as a family trust company and for many years had relied upon employees of a family corporation to do the bookkeeping and gather data for investment decisions. The Minnesota Supreme Court said:
*385 What are the usual and normal services to be performed by a trustee in return for his compensation? All services involved in the exercise of his discretionary powers or duties in managing the trust and, in addition, certain ministerial duties, are covered by such compensation. Clearly, one of the ministerial duties which a trustee should perform in return for his specified remuneration is that involved in the routine chore of keeping accurate and complete bookkeeping records and in preparing periodic administration accounts. * * * In unusual and complicated cases, there may be both justification and need for the employment of specialized skill in the preparaof certain periodic accounts or in establishing a fundamental plan of bookkeeping. * * * [26 N.W.2d at 211]
The view there expressed is consistent with and based on the decisions of the New Jersey courts. See Hagedorn v. Arens, 106 N.J. Eq. 377, 383 (Ch. Div. 1930).
One of the usual duties of a trustee where the corpus of the trust has to produce an income is to make investment decisions. 1 Restatement, Trusts 2d, § 171 comment (h); 6 N.J. Practice (Clapp, Wills and Administration) (3d ed.), § 995; 3 Scott, Trusts (3 ed) § 188.3.
As earlier noted, the standard in New Jersey is the pain and trouble incurred by the trustee, N.J.S.A. 3A:10-1, or actual services rendered, N.J.S.A. 3A:10-2(a) (2).
The court having found that BTC did not incur the usual pain and trouble on preserving and handling corpus, it should not be compensated at the usual rate.
The court has not been referred to any case which has isolated out a factor for work associated with investments. The court has considered the data in the SEC report, supra, which breaks out investment management costs from fees for overall administration of investment companies and mutual funds, as well as the data collected in Bogert, Trusts and Trustees (2 ed.) § 975 where the fee schedules set forth show a tendency to reduce the percentage as the corpus increases in size.
If a trust of average difficulty entitles a trustee to a commission of 2 1/2% to 3 1/2%, compare In re Seabrook, supra, the court concludes that about 1% to 1 1/2% of such a trustee's commissions would be allocable to investment *386 activity. The normal rate should be reduced by a percentage in that range.
The court distinguishes this case on its facts from the situation that Shattuck discussed in his article. The trustee who holds part of the corpus in a diversified mutual fund to get diversification has to handle it the same as any other investment. If such a trustee placed the whole of the corpus in such a fund, then there would be a question of the pain and trouble incurred. The question does not arise under a bank common trust fund. N.J.S.A. 17:9A-42 prohibits separate compensation. On the facts before the court, the court finds BTC incurred minimal pain and trouble in respect to the corpus reflected by the BSC common stock.
The court does not find persuasive the suggestion that BTC took less than the statutory rate of income commissions for many years, which benefitted the income beneficiaries, and therefore it should be deemed to have compensated the beneficiaries for the work done by the BSC staff which reduced their dividends, with the result that its corpus commissions should not be reduced. Income commissions are intended to compensate for work related to income. Since BTC has asked for and will be allowed income commissions of $234,060.01 for the 14 years of the income accounting of the Manning D-6 trust, even at the rates lower than N.J.S.A. 3A:10-2 for a portion of that period, the court does not find any evidence to correlate income commissions with corpus commissions. The increase in rates from 1955 were not so handled. Further, as more fully discussed below, where commissions are not taken from income that is paid out, a fiduciary is deemed to have waived such commissions. By analogy, BTC should not derive an indirect benefit by offset.
The court notes that there is a substantial period of administration left and that in reorganizing BSC, BTC may incur difficult problems in preserving corpus; hence, there is need for future compensation.
*387 If this trust is managed as it has been in the past, in terms of pain, trouble and risk, this court would not expect maximum commissions to be allowed, but commissions in the range of 2%. The court concludes that interim corpus commissions on the BSC common stock should be allowed at the rate of 1 1/2% on corpus in excess of $100,000 attributable to BSC common stock in all trusts.
Since over 330,000 shares of BSC stock are held in trusts where corpus commissions are to be paid from income, the court has set the rate slightly higher than it otherwise would because there may be no source from which to pay. Under the particular facts, the allowance is more in the nature of a final accounting than an interim one.
In respect to the other four trusts, BTC did have the pain and trouble of all investment activity except gathering the basic data for decision making for a number of years. The advice came from the staff of BSC in which the various families as groups held equal holdings to those in BTC. The incremental cost was not severe until it was paid for.
The court concludes that no adjustment should be made in the commissions to BTC because of the advice received without charge. The settlors of many of the trusts were actively involved in the affairs of BSC and BTC. In later trust indentures they have provided that BTC is to have commissions on the same basis as other trustees. Under such circumstances the court finds the situation to be comparable to that in In re Seller's Case, 31 Del. Ch. 158, 67 A.2d 860 (Ch. 1949), where the court approved as an expense charge the fees for an investment adviser and full compensation to an individual trustee who was a practicing physician and close personal friend of the testator. That court concluded that the testator under those circumstances did not intend the trustee to do that work and did not intend that his compensation be reduced. Based on the record, the activity of the settlors and the language of the later indentures, the court concludes *388 that the settlors knew BTC was not doing the work but did not intend to reduce its right to compensation.
In respect to the rates for the other trusts, the set utilizing he rates from N.J.A.C. 18:26-7.10 produces an effective rate of 3.4% on the first $1,000,000. It is true, as counsel for BTC urges, that the effective rate will drop as the 2% rate is applied to larger amounts of corpus. But the question remains whether a 2% constant rate is appropriate. It is also true that a number of the other trusts do not have corpus as large as D-6, for example, in E-16 the corpus at inventory is about $625,000.
If 2-1/2% to 3-1/2% is a proper award for an average trust for full administration, then the use of those rates on an interim account allows no room for final adjustment.
The court also notes that an effective rate of 3.4% is higher than the Legislature authorized by L. 1972, c. 147, supplement to N.J.S.A. 3A:10-2.
N.J.S.A. 3A:10-2(c) provides:
Fiduciaries may annually, without court allowance, take sums as follows on account of corpus commissions: if there is but one fiduciary, the amount so taken may equal 1/5 of 1% of the first $100,000.00 of corpus and 1/10 of 1% of the value of the corpus in excess of $100,000.00 or $1,100.00, whichever is less; and, if there are two or more fiduciaries, the amount so taken may equal the commissions which may be taken pursuant to this subsection when there is but one fiduciary, plus 1/5 of such commissions for each fiduciary more than one. * * * The failure of a fiduciary or fiduciaries to take commissions in any year as provided in this subsection shall not constitute a waiver of the right of such fiduciary or fiduciaries to take in a subsequent year the commissions not taken for such year. Commissions taken as provided in this subsection shall be subject to review on intermediate and final accountings, and to the extent that aggregate commissions so taken exceed the commissions allowable under paragraphs (2) and (3) of subsection a. of this section, they shall be disallowed.
The effective rates are 5% on the first $100,000, 2-1/2% on the excess over $100,000 and under $900,000 for a 25-year period or 2-3/4% for $1,000,000. No rate is set for corpus above $1,000,000.
*389 Significantly, the Legislature provided in the last sentence that what a fiduciary takes as commissions under N.J.S.A. 3A:10-2(c) is subject to review on intermediate account to see if they exceed what would be allowed under N.J.S.A. 3A:10-2(a) (2) and (3). Subsection (a) (2) sets a standard of "actual services rendered" and a maximum rate of 5% for each period of 25 years (25 years multiplied by 1/5 of 1% for each year) but no maximum on the ultimate percentage of corpus to be allowed except as limited by the number of years multiplied by 1/5 of 1% per year.
The provisions now in N.J.S.A. 3A:10-2(a) (2) were in the statute at the time In re Moore, supra, was decided. The Supreme Court, after pointing out that the base upon which commissions had been computed was improper, said:
The Appellate Division was therefore unquestionably correct in vacating it and directing a new award to be made, limited to a base of corpus administered during the accounting period and a rate not in excess of 1/5 of 1% per year thereof, with due regard to the intermediate nature of the accounting. 91 N.J. Super. at pp. 330-331. This means with proper consideration of and giving allowance to the various factors we have previously mentioned as guidelines for such a situation, which will undoubtedly result in arriving at a rate appreciably lower than the maximum. The court may use as the base total gross assets in hand during the period either at book value or market value * * * [50 N.J. at 156; emphasis supplied]
The Supreme Court then commented that the period of time said assets were administered should be considered and whether increases were due to efforts of the trustees or inflation.
The language of the supplement to N.J.S.A. 3A:10-2 does not express an intent to overrule or change the decision in In re Moore, supra. The legislative history does not reveal any such intent. The statement attached to the bill when considered by the Legislature provided, "This does not increase fiduciaries' commissions. It simply permits them to reimburse themselves annually for corpus commissions, as they may now do in respect to income commissions, without waiting until a formal accounting." From the Legislature's *390 selection of a 2-1/2% rate on corpus not in excess of $900,000 the court infers that the Legislature intended that interim allowance on corpus should reflect more than just overhead costs but some compensation for service as well, subject to judicial review under the guidelines of In re Moore, supra, particularly where the base used is other than inventory or presumptive value. Stated more succinctly, where the fiduciary uses inventory value, there is a suggestion, but not direction, that 2-1/2% over $100,000 but under $1,000,000 may be proper, but where market value is used, which includes large elements of unrealized gain, caution is to be used, as said in In re Moore:
* * * While it seems clear enough that current market value may be an element in fixing commissions intermediately, we agree with the view of the Chancery Division in In re Cox, supra (21 N.J. Super., at p. 288) that "* * * it is not especially persuasive for the allowance of unusually large commissions". See also In re Estate of Higgins, supra (61 N.J. Super., at pp. 296-297). Indeed it is quite risky, for there can be a decrease in such value before termination of the administration through no chargeable fault of the fiduciary. In addition, an accountant is free to choose the date of closing of an intermediate account at a time when market values of the assets are high. [50 N.J. at 148, 149]
In Blauvelt v. The Citizens Trust Co., 3 N.J. 545 (1950), the Supreme Court held allowance of final corpus commissions of 2-1/2% on a trust that was administered for about 20 years, less amounts previously awarded on interim accountings, was adequate compensation for pain, trouble and risk. It also held:
The plaintiff further urges that the trustee had previously been allowed commissions on the sum of $32,900, the inventory value of the stock, and that since the stock subsequently resulted in a total loss, the amount of commissions previously allowed on the value of the stock should be deducted from the trustee's total commissions. We do not agree with this contention. The allowance of commissions on the inventoried value of the stock was properly made because it is conceded that the stock was valued at $32,900. Since we have held that the resultant loss in the value of the stock is not chargeable to the negligence of the trustee it follows that the contention of the plaintiff on this phase of the case is resolved against him. [at 559, 560]
*391 The fact that the Legislature required the accountant to prove market value basically did not change the duties of the accountant for listed securities, because R. 4:87-2(b)(1) required a fiduciary to show that value. Nor did such a requirement eliminate the risk of loss due to market and economic factors such as shown in the D-6 trust of over $9,000,000 in less than seven years.
The manner of computing the corpus commissions for these four trusts is shown by the computation for the commissions in D-7:

 STATEMENT AS TO COMPUTATION OF CORPUS COMMISSIONS
Average year-end market value of
 Trust Corpus for years from 1935
 through 1960 $ 1,318,819
 ===========
 5% on first $100,000 of corpus $ 5,000
 3 1/2% on next $400,000 of corpus 14,000
 3% on next $500,000 of corpus 15,000
 2% on balance 6,376
 _________
Total commission for period from
 1935 through 1960 $ 40,376
 ===========
Total sum of year-end market values
 of trust corpus for years from 1961
 through 1972 $37,708,709
 ===========
 $37,708,709 x .001 = $ 37,708
 ===========
Commissions for period from
 1935 through 1960 $ 40,376
Commissions for period from
 1961 through 1972 37,708
 ___________
 Total commissions calculated $ 78,084
 By letter subsequent to the decision the trustee changed
 the year 1961 to 1960, which is accurate.

The use of an average year-end market value for the first 25 years gives recognition to the time period that assets were administered. The two factors being correlated are time and dollars. The court, with the assistance of counsel for BTC, *392 has checked the results of computing separately each year the commission allowance on the year-end base in a trust where there was a substantial infusion of corpus in a late year in the period. The difference in result is not significant. There may be a break-point where the addition is so substantial that a difference results. Adding the year-end value at either book or market, but on a consistent basis, for the period, and dividing the sum by the number of years to weigh for time of administration, gives a base upon which to compute corpus commission. If market value is used, this tends to average the unrealized appreciation over time of administration.
This technique was abandoned after the first 25 years because the premise for computing commissions changed from a graduated rate structure to one using a straight percentage against a year-end base. On this premise, the year-end bases were simply totaled and the flat percentage applied. The rate used was 1/10 of 1%, from N.J.S.A. 3A:10-2(c).
However, an inspection of the sum of all year-end bases shows that in many of the 12 years the base exceeded $1,000,000. The use of a flat percentage does not take into account unrealized appreciation in the base, whereas prior decisions indicate the rate should be adjusted for such a factor.
The court concludes that the use of the rate structure based on N.J.A.C. 26:18-7.10 produces excessive commissions for an interim accounting and should not be used.
The court also concludes that the use of the sum of the year-end bases makes it difficult to properly allow an interim commission with due allowance for unrealized appreciation. This factor can be better dealt with by using the sum of the year-end values divided by the number of years of administration. It should not be a difficult task for a trustee keeping records to record the total of year-end values in the future. This latter technique gives more visible effect to the period of administration. The court disallows the use of the sum of the year-end bases, it should not be allowed.
The court concludes, because of L. 1972, c. 147, 5% may be allowed, and does allow it on the first $100,000 of corpus *393 for the first 25 years, and a proportionate percentage according to elapsed time for the periods after 25 years.
Where inventory value is used and market value is higher, or the corpus contains substantial amounts of sound bonds and corpus is at or near inventory, with apparent losses attributable to changes in interest rates near the time of accounting, allowance of 2 1/2% on the excess over $100,000 to $1,000,000 is permissible, 2% on the next $1,000,000, 1-1/2% on the next $1,000,000 and 1% on the excess over that which rates are computed on the basis of a 25-year period.
The court has stated the rates in terms of a 25-year period because the mathematics in N.J.S.A. 3A:10-2 suggest it and trustees and courts will have to use that mathematics.
The court thinks that the guidelines of In re Moore, supra, is correct; that there is only one overall period of administration upon which final commissions are allowable. Nevertheless, the Legislature has authorized a maximum of 5% corpus commissions each 25 years and has authorized applying for interim allowances against it.
Where market value exceeds inventory value, a court has to exercise its judgment, or the use of the above rates may result in paying excessive commissions before final accounting. One significant factor is the difference between market value and inventory value. Another is the distribution of corpus between bonds, mortgages, real estate, stocks and other securities.
Since allowance is also made for pain, trouble and risk, the court notes that BTC has carefully reviewed the investments in these four trusts: all show realized gains in excess of losses and three show market value appreciation over that. The fourth trust has been influenced by interest rate changes in respect to market value gain over inventory. In some of these trusts BTC has had to deal with investments, and for beneficiaries, in countries other than the United States.
Considering the nature and quality of the assets in corpus, the extent of the difference between market value and *394 inventory, and the pains, trouble and risk of BTC, the court finds it proper and does allow commissions at the rates last mentioned on a base to be computed on the year-end average method. The computation of averaging is to be carried forward from the twenty-fifth year.
The reasons that this court has scaled down the rate as the size of the base goes up are: (1) it seems to be the practice of fiduciaries to do so, Bogert, Trusts and Trustees (2 ed.) § 975; (2) based on the accountings that this court has seen, as the value of the corpus rises the size of the holdings increase, and the number of tax returns and accountings do not increase with size, and (3) a trustee's overhead distribution should drop proportionately as the size of a trust increases.
To illustrate the method outlined in terms of the D-7 trust, the following is set forth:

Average year-end market value
 for first 25 years of
 administration $1,318,819
 ===========
 5% on first $100,000 $ 5,000.00
 2 1/2% on next 900,000 22,500.00
 2% on next 318,819 6,276.28 33,776.28
 _________ __________
 2% on next $318,819 $22,500.00 $1,318,819
Average year-end market value
 for next 13 years of
 administration $2,900,669
 5% on first $100,000 $ 5,000
 2 1/2% on next 900,000 22,500
 2% on next 1,000,000 20,000
 1 1/2% on next 900,669 13,510
 _______
 61,010
 13 ÷ 25 = .52 × $61,010 31,725
 Total interim commissions $ 65,601
 ===========

This court does not suggest that the above-mentioned rates should be used without carefully considering all the factors in In re Moore. As noted earlier, there are realized gains, *395 there is a good mix of bonds and stocks, and the trustee by effort and not just inflation has increased corpus. The court did not find a wide disparity between inventory value and market value, considering the overall quality of assets. Where such a situation exists the rates might be reduced by the means employed in In re Estate of Seabrook, supra, factor the difference as a percentage and apply the discount to the relevant rates.
The court considered developing a single effective rate but believes the technique better illustrates what it is doing and is easier to apply.

4. HOW PAYMENT OF INCOME WITHOUT DEDUCTION OF, OR CREATION OF RESERVE FOR, CORPUS COMMISSIONS CHARGEABLE TO INCOME BAR BTC's CLAIM.
The question of whether BTC's right to allowable corpus commissions which are payable out of income is barred because BTC has paid out the income for the prior periods arises in the Manning D-6 trust and the Boegner A-23 trust.
Each guardian ad litem has submitted a brief supporting the contention that corpus commissions are payable from income. The matter has not been strenuously argued in opposition but rather the suggestion advanced on behalf of the exceptants that the court authorize payment from corpus.
The settlor of a trust has the right to direct whether commissions and expenses shall be paid out of income or corpus. 3 Scott, Trusts (3d ed.), § 233.3 A number of courts have held that where the intention is manifest that commissions and expenses be paid from income, the provision should be so applied. See West Coast Hospital Ass'n. v. Florida Nat'l Bank of Jacksonville, 100 So.2d 807, 810 (Fla. Sup. Ct. 1958); In re McCaskey's Estate, 307 Pa. 172, 160 A. 707 (Sup. Ct. 1932); Rossi v. Davis, 345 Mo. 362, 133 S.W.2d 363 (Sup. Ct. 1939); Old Colony Trust Co. v. *396 Walker, 319 Mass. 325, 65 N.E.2d 690 (Sup. Jud. Ct. 1946).
One guardian ad litem suggests that a reason for so providing that commissions be payable out of income was to strengthen the case for their deductibility for income tax purposes. The state of the law was unsettled in 1931. Compare City Bank Farmers Co. v. C.I.R., 112 F.2d 457 (2 Cir.1940), with James A. Knox 4 T.C. 258 (1945), applying the law in effect since 1942 allowing deduction for income tax purposes whether or not payable out of income.
A persuasive argument is that the parties have in the past deducted legal fee and guardian ad litem allowances from income without objection on earlier accountings.
In the case of the Manning D-6 trust there is a practical reason for not holding corpus commissions payable out of corpus. The corpus consists of BSC stock which can only be sold to other family trusts. Such a holding for this and similar trusts would trigger a series of sales with substantial capital gains to raise the cash from corpus to make the payment. This result would be contrary to the expressed intent to preserve corpus.
In response to the specific question as to waiver by failing to take out of, or reserve against, income, BTC urges that corpus commissions may not be set up in an accounting until allowed by a court, at least in New Jersey. Income commissions, on the other hand, are fixed by statute, N.J.S.A. 3A:10-2(a) (1), and failure to take is a waiver to the extent income is not on hand from which to pay it. Parker v. Wright, 103 N.J. Eq. 535, 536 (Ch. 1928).
BTC urges that the cases that hold a trustee who has not taken income commissions has waived them are generally decided upon a finding that such trustee intended to waive them, and it cites the following statement for an opposite result where there is no intent to waive:
* * * If the trustee pays over income without deducting the compensation to which he is entitled with respect to such income but without evidencing an intention to forego his claim to such compensation, *397 he can deduct such compensation out of any future income or principal payable to the same beneficiary, unless the beneficiary has so changed his position that it would be inequitable to allow the trustee to make such deduction. [3 Scott, Trusts (3 ed.) § 242.8]
The court in its letter posing this question referred to this section. Counsel for the exceptants in the reply memorandum have not pointed to, or urged, any basis for an estoppel which the court did not pass upon earlier.
The court notes that in the Manning D-6 trust accounting there was also included another trust consisting entirely of accumulated income. The court has been informed, at oral argument on the motion to amend the complaint, that BTC paid out the entire corpus of the accumulated income trust to Diana Guest Manning in 1976 pursuant to her request.
The court also notes that the income for the period January 1, 1960 to October 31, 1974 in the Manning D-6 trust is approximately $7,918,000.
As previously noted, BTC has heretofore reserved its rights to claim corpus commissions.
The court concludes that BTC should have a right to take its allowed corpus commissions as against future income payable to Diana Guest Manning, subject to the following limitations: that the combined income commissions (6%) and corpus commission calculated as a percentage of income shall not exceed an aggregate of 18% of income in any one year, or if the dollar amount of income in any one year for corpus commissions exceeds $60,000, then $60,000 only shall be taken on account of corpus commissions.
The court has read the cases cited by Professor Scott to support the following passage:
Where the trust is a spendthrift trust, there is some authority to the effect that the trustee is in substance making an advance to the beneficiary and that he is not entitled to reimbursement from income thereafter accruing. [Id.]

* * * * * * *
In Ten Broeck v. Fidelity Trust & Safety Vault Co., 88 Ky. 242, 10 S.W. 798 (Ct. App. 1889) the court found *398 that the trustee father expressed an intent to waive commissions in favor of his ill daughter and that the administrator of the father's estate should not be allowed to take from the daughter's future income for the benefit of his creditors. The other case is Spencer v. Spencer, 38 App. Div. 403, 56 N.Y. 460 (App. Div. 1899), where the issue involved statutorily-fixed income commissions. The court relied upon the rule that where commissions are known and income paid out, then there is no source of payment left rather than the spendthrift provision of the trust.
In Ballantine v. Young, 74 N.J. Eq. 572 (Ch. 1908), aff'd 76 N.J. Eq. 613 (E. & A. 1909), the court held that where trustees had improperly paid out as income a form of revenue that should have been added to corpus and had done the reverse, i.e., held as corpus another revenue which should have been paid out as income, it was proper to let the trustees adjust the matter and not pay out the additional income.
The court may take judicial notice of its own records. The records in respect to these five trusts and the related proceedings do show a pattern of an intent to treat each branch of the family equally. In some trusts similar to A-23 the corpus commissions have not been objected to. In most trusts there is no basis for objection. To apply for the first time in this context the logically correct statement of Professor Scott would produce a result consistent with the reasoning of some of the old common law courts from which the equity courts were developed to grant relief.
The court concludes that corpus commissions are allowable in the Boegner A-23 trust and should be paid, subject to the same limitations set forth above for the Manning D-6 trust.

EXCEPTIONS 8 AND 9 AND REQUEST FOR INSTRUCTIONS TO BTC NOT TO CONTRACT WITH BTNA.
It is sufficient to state that the exceptants here attack the proposed contracts and arrangements between BSC, BTC *399 and BTNA on a variety of grounds including, but not limited to the following  the amounts are excessive and BTC as trustee cannot contract for services.
Since BTC has not sought to charge as an expense to any of the trusts in any of the accountings before the court any of these charges, the issues posed are outside the matter before the court. If, on a future accounting, BTC seeks to deduct as an expense to the trust, then exceptants may object. See Hagedorn v. Arens, supra; In re Butler's Trust, supra.
As pointed out in In re Butler's Trusts, a trustee normally is responsible for its own rent, heat, light, clerical force and other expenses of conducting a business out of its own income. If the income from the commissions it earns is not enough, it cannot charge ordinary expenses to the trusts. In such a case it should transfer the administration to another trustee and go out of business. The Butler Trust Company did. See In re Butler's Trust, 260 Minn. 550, 110 N.W.2d 873 (Sup. Ct. 1961) (reversing disallowance of corpus commissions from corpus after 34 years of administration where successor trustee filed for the allowance and not the original trustee. Successor trustee had contracted to wind up trust and to pay any allowance for the 34 years of administration to prior trustee.)
The law in New Jersey is no different. A trustee, and not the trust, is liable on a trustee's individual contracts. Brown v. Fidelity Union Trust Co., 135 N.J. Eq. 404, 415 (Ch. Div. 1944).
The court concludes that exceptions 8 and 9 are not germane to the issues before the court and the request for directions is improper.
Submit separate computations of commissions in accordance with the foregoing and separate judgments for each trust.

*400 APPENDIX

BESSEMER TRUST COMPANY, AS TRUSTEE UNDER AGREEMENT OF TRUST DATED DECEMBER 24, 1931, MADE BY JOHN S. PHIPPS, AS DONOR, ESTABLISHING A TRUST FOR THE PRIMARY BENEFIT OF DITA DOUGLAS NAYLOR-LEYLAND AND J. GORDON DOUGLAS III, SAID TRUST BEING KNOWN AS TRUST NO. A-23, PLAINTIFF, v. JOHN H. PHIPPS ET AL., DEFENDANTS.
BESSEMER TRUST COMPANY, AS TRUSTEE UNDER TRUST INDENTURE DATED DECEMBER 23, 1940, MADE BY JOHN S. PHIPPS, AS DONOR, ESTABLISHING A TRUST FOR THE PRIMARY BENEFIT OF MARGARET BOEGNER, SAID TRUST BEING KNOWN AS TRUST NO. A-42, PLAINTIFF, v. MARGARET BOEGNER ET AL., DEFENDANTS.
BESSEMER TRUST COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, AS SUCCESSOR CORPORATE TRUSTEE UNDER INDENTURE OF TRUST DATED JUNE 3, 1932, MADE BY AMY GUEST, AS DONOR, ESTABLISHING A TRUST FOR THE PRIMARY BENEFIT OF DIANA GUEST MANNING, AND HOWARD PHIPPS, AS FORMER INDIVIDUAL TRUSTEE UNDER SAID INDENTURE OF TRUST, AS MODIFIED (SAID TRUST BEING KNOWN AS TRUST NO. D-6), PLAINTIFFS, v. DIANA GUEST MANNING ET ALS., DEFENDANTS.
WINSTON FREDERICK CHURCHILL GUEST AND BESSEMER TRUST COMPANY, AS TRUSTEES UNDER TRUST INDENTURE DATED AUGUST 7, 1935, MADE BY DIANA GUEST SEVASTOPOULO (NOW DIANA GUEST MANNING) FOR THE BENEFIT OF DIANA GUEST MANNING AND OTHERS, SAID TRUST BEING KNOWN AS TRUST NO. D-7, PLAINTIFFS, v. DIANA GUEST MANNING ET AL., DEFENDANTS.
BESSEMER TRUST COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, AS TRUSTEE UNDER TRUST AGREEMENT DATED MARCH 5, 1945, MADE BY HOWARD PHIPPS, AS DONOR (ACTING IN HIS CAPACITY AS INDIVIDUAL TRUSTEE OF A TRUST CREATED BY HELEN MARTIN BY A CERTAIN INDENTURE DATED JUNE 3, 1932, AS AMENDED), ESTABLISHING A TRUST FOR THE PRIMARY BENEFIT OF ESMOND BRADLEY MARTIN, JR., SAID TRUST BEING KNOWN AS TRUST NO. E-16, PLAINTIFF, v. ESMOND BRADLEY MARTIN, JR. ET AL., DEFENDANTS.
NOTES
[1] See appendix for formal captions.
[2] An interesting contrast is presented between N.J.S.A. 3A:10-2 and N.J.S.A. 22A:2-15. Under the former the fiduciary is given an option as to whether to use inventory value or current value for computing commissions. Under the latter, the Clerk of the Superior Court appears to be restricted to inventory value. The result is that in cases where the fiduciary shows no change in inventory value because securities have not been sold but such securities have increased in market value, the Clerk of the Superior Court may not collect any fee for auditing subsequent accounts but the fiduciary may receive substantial commissions. In the D-6 trust, the difference in one item other than BSC common stock resulted in a fee of $.65 under N.J.S.A. 22A:2-15 but the difference between inventory value and market value, after discount. for BSC is over $20,000,000 not subject to audit fee. If current market values are to be the basis for awarding commissions, Legislature should give some thought to having the Clerk of the Superior Court check such values and adjust the audit fees.
[3] "No single standard for determining `fair value ... in good faith' can be laid down, since fair value depends upon the circumstances of each individual case. As a general principle, the current `fair value' of an issue of securities being valued by the Board of Directors would appear to be the amount which the owner might reasonably expect to receive for them upon their current sale. Methods which are in accord with this principle may, for example, be based on a multiple of earnings, or a discount from market of a similar freely traded security, or yield to maturity with respect to debt issues, or a combination of these and other methods. Some of the general factors which the directors should consider in determining a valuation method for an individual issue of securities include: 1) the fundamental analytical data relating to the investment, 2) the nature and duration of restrictions on disposition of the securities, and 3) an evaluation of the forces which influence the market in which these securities are purchased and sold. Among the more specific factors which are to be considered are: type of security, financial statements, cost at date of purchase, size of holding, discount from market value of unrestricted securities of the same class at time of purchase, special reports prepared by analysts, information as to any transactions or offers with respect to the security, existence of merger proposals or tender offers affecting the securities, price and extent of public trading in similar securities of the issuer or comparable companies, and other relevant matters."

In respect to the duty of an auditor, said release in part provides:
"In the case of securities for which market quotations are readily available, the independent accountant should independently verify all the quotations used by the company at the balance sheet date and satisfy himself that such quotations may properly be used under the standards stated above.
In the case of securities carried at `fair value' as determined by the Board of Directors in `good faith', the accountant does not function as an appraiser and is not expected to substitute his judgment for that of the company's directors; rather, he should review all information considered by the board or by analysts reporting to it, read relevant minutes of directors' meetings, and ascertain the procedures followed by the directors. If the accountant is unable to express an unqualified opinion because of the uncertainty inherent in the valuations of the securities based on the directors' subjective judgment, he should nevertheless make appropriate mention in his certificate whether in the circumstances the procedures appear to be reasonable and the underlying documentation appropriate."
[1] We have in mind that even an estate of minimal pain, trouble and risk a rate of at least 1% would ordinarily be allowable.